**CHICAGO AND NORTH WESTERN RAILWAY COMPANY, Plaintiff,**

v.

**UNITED TRANSPORTATION UNION, Defendant.**

No. 69 C 2401.

United States District Court,
N. D. Illinois, E. D.

Dec. 22, 1971.

See also, D.C., 330 F.Supp. 646.

James P. Daley and Robert Schmiege, Chicago, Ill., and William H. Dempsey, Jr., David Booth Beers and Shea & Gardner, Washington, D. C., for plaintiff.

John J. Naughton, Chicago, Ill., and John H. Haley, Jr., East St. Louis, Ill., for defendant.

PERRY, District Judge.

## MEMORANDUM OPINION AND DECREE

This cause comes on for final judgment; and the Court, having heard the evidence and considered the briefs and arguments of counsel, hereby makes its findings of fact and conclusions of law:

### FINDINGS OF FACT

1. Plaintiff Chicago and North Western Railway Company is a corporation engaged in the transportation by rail of passengers and freight in interstate commerce and a "carrier" within the meaning of Section One (1) of the Railway Labor Act (45 U.S.C. § 151) and will hereinafter be referred to as "CNW". At the time of the commencement of this action the CNW consisted

of separate corporations which had been merged into the CNW as districts thereof; the CNW Railroad Company as it existed prior to such mergers had become known as the "CNW, Proper"; the former Chicago, St. Paul, Minneapolis and Omaha Railroad Company had become the "Omaha District" of the CNW; the former Milwaukee & St. Louis Railroad Company had become the "M & St. L." District of the CNW; the former Litchfield & Madison Railroad Company had become the "L & M" District of the CNW and the former Chicago Great Western Railroad Company became the Missouri District of the CNW in August 1969.

2. Prior to January 1, 1969 the Brotherhood of Railroad Trainmen was a voluntary union labor organization and the representative under the Railway Labor Act of train and yard service employees of some of the CNW and some of the other railroads which were merged into and became districts of the CNW; the Order of Railway Conductors & Brakemen was the representative under the Railway Labor Act of some train service employees of the CNW and other railroads which were merged into the CNW and the Switchmen's Union of North America was the representative under the Railway Labor Act of yard service employees of railroads which were merged into the CNW. Each of those labor organizations was represented on each such railroad by separate General Chairmen and separate collective agreements which existed between each such General Chairman and each such railroad with respect to rates of pay, rules and working conditions were retained after such railroads were merged into and became districts of the CNW. On January 1, 1969 the Brotherhood of Railroad Trainmen, Order of Railway Conductors & Brakemen and the Switchmen's Union of North America were merged into and became a part of Defendant United Transportation Union which became a party to each separate collective agreement theretofore existing between the separate railroads and the several labor organizations as the representatives of employees of the CNW and the other railroads which were merged into and have become districts of the CNW.

3. The Award of Arbitration Board 282 which was made in pursuance of Public Law 88–108, 45 U.S.C. § 157 (1971 Supp.) became effective June 24, 1964 for a period of two years. It prohibited changes in main line crews consisting of a conductor and two trainmen in road service but did authorize changes in main line crews consisting of a conductor and either more than two or less than two trainmen. It also authorized changes in branch line and yard crews irrespective of the number of persons theretofore employed in such crews. Px 1, p. 14 paragraph A(2), A(3). It also provided for the arbitration of disputes not resolved by agreement with respect to the number of persons to be employed in crews in which changes were authorized in accordance with certain specified guide lines; one of which was "practices regarding the consist of crews in comparable situations where such practices are not in dispute". Px 1, pp. 15–19. It also provided for protection of the employment of certain persons. Px 1, 19–20.

4. The CNW employs a total of 808 crews; 245 in main line service, passenger, or through freight service; 165 in branch line or local or way freight service and 398 in yard service. The Award of Arbitration Board 282 did not authorize any reduction in the 245 main line crews, although it did authorize changes in the branch line and yard crews, 67 main line crews, 52 branch line crews and 102 yard crews for a total of 221 crews were not subject to reduction under the law of Wisconsin. Thus, at the commencement of the dispute involved in this case there were a total of 587 crews employed by CNW outside the State of Wisconsin; 178 in main line passenger or through freight service, 113 in branch line or way freight service and 296 in yard service.

5. Under the Award of Arbitration Board 282 CNW had obtained authority to employ a conductor and less than two trainmen in 72 out of a total of 113 branch line or way freight and local service which were employed outside the State of Wisconsin and to reduce to a foreman and less than two helpers 143 out of a total of 296 yard crews employed outside the State of Wisconsin, or a total of 215 crews and yard crews which were employed outside the State of Wisconsin. Tr. 220–224, 258, 289, 326–327, 353, 368, S.Tr. 226–233.

6. In July 1965 in pursuance of Section 6 of the Railway Labor Act the Union served on the CNW notice of its desire for an agreement to become effective on January 25, 1966, the day following the expiration of the Award of Arbitration Board 282, to provide for a minimum crew consist of not less than a conductor and two or in some instances three trainmen in all road service and of not less than a foreman and two helpers in yard service. Px 9, 10, Tr. 89, 226–227.

7. CNW refused to meet, confer, discuss or negotiate with the Union with respect to the Union's notices, on the ground they were legally ineffective, (J. R. Wolfe Aff. p. 11, Tr. 230,) after which, on October 4, 1965 the National Mediation Board, hereinafter "NMB", assumed jurisdiction of the dispute arising from the Union's notices, J. R. Wolfe Aff. p. 12.

8. On December 24, 1965 in pursuance of Section 6 of the Railway Labor Act, CNW served notice on the union of its desire for an agreement for CNW to have the unrestricted right to determine when and if trainmen should be used in each crew in road and yard service and if used, the number and classification of employees to be used and for the elimination of all contrary agreements, rules, regulations and practices. Px 12.

9. CNW also proposed that if no agreement should be reached that the dispute arising from the union's July 1965 and CNW's December 1965 notices be referred by the unions' representatives on the CNW to a committee to be established by the union to handle those notices concurrently with other notices served by the union and by other railroads on the union for further handling on a national basis with a committee representing the railroads. Px 12.

10. The unions' representatives on the CNW met with representatives on CNW on January 18, 1966, discussed CNW's notice but declined to discuss the union's notice concurrently with and declined to agree to refer the dispute to a national committee to be handled on a national basis concurrently with committees representing the CNW and other railroads which had served the same notice on the union in December 1965.

11. Thereafter, at the request of CNW, the NMB assumed jurisdiction of the dispute arising from CNW's December 1965 notice as it did of disputes arising from notices served by other railroads on the union in December 1965.

12. The positions of the parties became the subject of litigation in Akron & Barberton Belt R. Co., et al v. Brotherhood of Railroad Trainmen, 250 F.Supp. 691 (D.C., Mar. 3, 1966); 252 F.Supp. 207 (D.C., Mar. 28, 1966); 254 F.Supp. 306 (D.C., May 19, 1966) and Akron & Barberton Belt R. Co. v. Order of Railway Conductors & Brakemen, 253 F.Supp. 538 (D.C., April 19, 1966) in which CNW was a party plaintiff, for a declaratory judgment that the union's July 1965 notices were legally ineffective because they were served during the period the Award of Arbitration Board 282 was in effect and for an injunction against a strike by the union over the dispute arising from its notices.

13. On October 4, 1966 while the *Akron & Barberton Belt* case, was pending on appeal, the NMB terminated its jurisdiction of disputes between Atlantic Coast Line, Boston & Maine and Des Moines Union R. Co., (now a part of CNW) and the union which arose from notices served by and upon the union and those railroads in 1965 which were the same as those served by and upon CNW and the union (Dx 1, p. 13). The

railroads sought a declaratory judgment that the union had violated Section 2, First of the Railway Labor Act by not having bargained in good faith and by refusing to agree to national handling of the disputes arising from the aforementioned notices. Dx 1, pp. 2–34. The District Court found in favor of the union on the question of good faith bargaining but held the union had violated Section 2, First of the Railway Labor Act by refusing to engage in national handling of the dispute.

14. On May 12, 1967 the United States Court of Appeals for the District of Columbia Circuit decided the *Akron & Barberton Belt* cases (128 U.S.App.D.C. 59, 385 F.2d 581), reversed the decision of the District Court that the union's 1965 notice was legally ineffective because served on the railroads during the period the Award of Arbitration Board 282 was in effect; held that the union's notices were legally effective to impose upon the railroads their duty to bargain under Section 2 First of the Railway Labor Act and that the railroads, including the CNW, by refusing to enter into negotiations with the union on the union's 1965 notices, "had breached their statutory duty under the Railway Labor Act to confer and bargain"; that CNW and the other railroads had forsaken their right to insist on conferences and that the dispute properly had been advanced to mediation. (385 F.2d at 592, 594–598, 599).

15. On September 6, 1967 the United States Court of Appeals for the D.C. Circuit decided the *Atlantic Coast Line* case [Brotherhood of Railroad Trainmen v. Atlantic Coast Line Railroad Co.], 127 U.S.App.D.C. 298, 383 F.2d 225 reversed the decision of the District Court, held the union did not violate any duty under the Railway Labor Act by refusing to agree to national handling of the crew consist dispute arising from notices served in 1965 by the union on some 80 railroads and the counter-notices served on the union by those 80 railroads. (383 F.2d at 226, 228–230).

16. In January 1968 the Supreme Court denied petitions by the railroads for writs of certiorari in the *Atlantic Coast Line* case, [Atlantic Coast Line Railroad v. Brotherhood of Railroad Trainmen] 389 U.S. 1047, 88 S.Ct. 790, 19 L.Ed.2d 839 and in the *Akron & Barberton Belt* case, [Akron & Barberton Belt Railroad Co. v. Brotherhood of Railroad Trainmen] 390, U.S. 923, 88 S.Ct. 852, 19 L.Ed.2d 983.

17. In January 1965, before the dispute in this case arose, the former Brotherhood of Railroad Trainmen, hereinafter referred to as "BRT", made an agreement with the New York Central, the Pennsylvania R. Co., and the Erie-Lackawanna Railroads and their subsidiaries with respect to crew consist which came to be known as the Luna-Saunders Agreement. It provided for a minimum crew of a conductor, two trainmen in road service and a foreman and two helpers in yard service and for crews of a conductor and less than two trainmen in road service or a foreman and less than two helpers in yard service which had been so established prior to January 24, 1964 to continue as such. Dx 1, pp. 213–215, 226–227, 402–406.

18. On March 22, 1965, the union made an agreement with the B & O R. Co., and its subsidiaries which came to be known as the Luna-Touhy Agreement. It was substantially the same as the Luna-Saunders agreement. Dx 4, tab 2.

19. On August 11, 1966, the Reading R. Co., and the former BRT made an agreement resolving the crew consist dispute which arose from notices served by and upon the union and that railroad in 1965 which were the same as the notices served in 1965 by and upon the union and CNW and other railroads. That agreement, like the Luna-Saunders agreement provided for all road and yard crews to consist of a minimum of a conductor or foreman and two trainmen or helpers and for crews established at less than that number prior to January 25, 1964 to continue as so established. Dx 1, pp. 267, 422–425.

20. On September 16, 1967 the Southern Pacific Company made an agreement with the former BRT to establish a minimum crew consist in road service of a conductor and not less than two trainmen. Dx 4, tab 4.

21. On March 19, 1968 the President of the BRT met with the President and Chairman of the Board of CNW and discussed the crew consist dispute. The result of the meeting was an agreement for the parties to study the crews which had been working with less than a conductor and only one trainman in road service and a foreman and one helper in yard service and for the CNW Vice President of Personnel James R. Wolfe to meet with the union's general chairmen in May, June, July and August to try to settle the dispute. Tr. 239–40

22. In March 1968 an agreement which became known as the "Jacksonville Agreement" was made by the union with the Missouri Pacific Railroad Company, the Seaboard Coast Line Railroad Company and the Southern Railway Company with respect to the crew consist dispute. That agreement provided for the railroads to select 50% of the crews which had been reduced to less than two trainmen in road service and two helpers in yard service, immediately to be increased to a minimum of two trainmen and two helpers and for the remaining 50% to be subject to negotiation and if no agreement should be reached, for the dispute to be referred to the Presidents of the union and the railroads and if not resolved by them for the parties to revert to their self-help positions. Px 4, tab 5. A final agreement was reached without the dispute being referred to the Presidents of the union or of any of the railroads. Px 4, tabs 8, 10, 11, 12, 13 and 14.

23. Other final agreements were made resolving the crew consist dispute arising from the 1965 notices between the GM & O R. Co., on February 22, 1968 and the Union Pacific on March 1, 1968.

24. There were no negotiations between CNW and the unions representing its employees with respect to the merits of the crew consist dispute arising from their 1965 notices from the time the union's notice was served in July 1965 until May 16, 1968. Tr. 239–242

25. On March 8, 1968 CNW sent a letter to the union's representatives and to all of its train service employees on March 13, 1968 proposing an agreement for CNW to retain the authority it had obtained pursuant to the Award of Board 282 to man 215 crews with less than two trainmen in road service and two helpers in yard service and pay an additional $3.45 to each employee who worked in such a reduced crew. Px 14, 15. The union's representatives rejected the proposal as contrary to the policy of the union to substitute money for a safe crew complement, Px 13, which was in accordance with the policy adopted by the former BRT prior to its merger into UTU on January 1, 1969 which was confirmed by the President of the former BRT in his testimony in the Atlantic Coast Line case, Dx 1, pp. 161–165, 227, 376–377, 416–417 and in his testimony in Louisville & Nashville R. Co. v. United Transportation Union (J. R. Wolfe aff. p. 17).

26. The Constitution of the UTU into which the BRT was merged on January 1, 1969 contained no restrictions and there were no directives restricting the consideration of money in the resolution of the crew consist dispute. S.Tr. 251, 295–299

27. Representatives of the union and CNW met on six occasions, on May 16, June 12, June 20, July 17, August 6, and August 8, 1968 during which they discussed yard crews on the basis of studies made by CNW. At their last meeting in which the union's Vice President Tuffley participated, the union urged resolution of the dispute on the basis of agreements made on other railroads which was rejected by CNW which insisted upon resolution of the dispute on the basis of a study of each individual crew, Tr. 247, and that there had been no discussion of main line or branch line crews which the CNW desired to reduce under its notice of December 1965.

28. The union's Vice President then suggested calling in the National Mediation Board, hereinafter "NMB", Tr. 248.

29. The next day Maloney told Wolfe over the telephone that road jobs should be discussed before calling in the NMB and he would call Wolfe for further conference.

30. There were no further conferences between CNW and the union until April 22, 1969 because the union had struck the Belt Railway of Chicago over the crew consist dispute; Wolfe was engaged in negotiating agreements incident to the merger of the Chicago Great Western into the CNW; the union had called a strike against the Louisville & Nashville R. Co., over the crew consist dispute and the President had appointed an Emergency Board to investigate the crew consist dispute between the union and the Belt Railway; the Louisville & Nashville R. Co., and the Illinois Central R. Co. Wolfe and Maloney agreed to postpone further conferences until after the Emergency Board made its report. J. R. Wolfe Aff. 18–21. Tr. 240, 242–249, 254–255.

31. On April 14, 1969, the day after the Illinois Central had made an agreement with the union, Maloney called Wolfe for further conferences saying the President of the union was after him to get moving and they agreed to meet April 22, 1969. J. R. Wolfe Aff. 21, Tr. 255.

32. CNW and the union met on April 22 and 30, May 9 and 15, 1969, on which latter date they received notice a NMB mediator would arrive June 2, 1969 to commence mediation of the dispute. During those meetings the union's representative told the CNW it was the last railroad with which the crew consist dispute existed and the union's President was "champing at the bit" for a settlement to be made. The union urged an agreement similar to agreements made by other railroads, particularly those made by other railroads operating alongside the CNW. The CNW took the position that all CNW crews had not been discussed with union representatives on districts other than the CNW Proper.

The union's representatives on all the other CNW districts were called in and took the same position—that there was no need for a discussion of every CNW crew in view of the precedent set by agreements other railroads had made with the union, particularly those operating in the same terminals and same areas as the CNW but would be agreeable to variations elsewhere. J. R. Wolfe Aff. 24–25, 28–29; Tr. 260–261, 263, 267, 270–272.

33. In December 1969, CNW was familiar with agreements between the union by other railroads operating in the same place and alongside the CNW and considered that those agreements established a same general rule of returning 90% of the crews, consisting of a conductor and one trainman in road service and a foreman and one helper in yard service to two trainmen and two helpers and that all of the agreements established a national pattern of between 93 and 100% of the crews which were reduced to one trainman in road service and one helper in yard service being increased to crews consisting of two trainmen and two helpers. Tr. 345–347.

34. On June 2, 1969 Arthur Glover, a veteran mediator of the NMB commenced efforts to mediate the dispute. He first met with CNW's Vice President, J. R. Wolfe and reviewed the negotiations. Wolfe told him the union had taken the position in the Atlantic Coast Line case that the crew consist dispute should be settled on each railroad because of the differences in climate, terrain, hills, curves, etc., but the union had refused to discuss those matters and was insisting on increasing all crews reduced by CNW to a conductor and one trainman in road service and to a foreman and one helper in yard service by adding an additional trainman and/or helper on the ground that other railroads had made such agreements.

35. Wolfe stated the CNW should study each road crew which had been working with only one trainman and each yard crew that had been working with only one helper and then each such crew

should be discussed by CNW and the union. Mediator Glover and Wolfe agreed to meet the next day, June 3, 1969. At that time Mediator Glover asked Wolfe how long it would take CNW to make the crew studies it desired. Wolfe stated he thought there should be a study of every job. Mediator Glover said the union would not stand for that. CNW then suggested a recess for two weeks during which CNW would try hard in the next two weeks, to study 50 of the 180 crews working with only one trainman or helper. Later that day, Mediator Glover advised he wanted to meet both sides the next day. Tr. 273–277.

36. Representatives of the CNW and the union met with Mediator Glover on June 4, 1969. At Glover's request CNW stated the reason for the two week recess it desired for crew studies was to try to show the union why it should not insist on increasing the reduced crews based on what other railroads had done. The union took the position that the studies would not help in reaching an agreement. Wolfe was cognizant that even with a time and motion study of a particular crew there could be a basis for a difference of opinion whether the crew should consist of two trainmen or only one in road service and of two helpers or only one in yard service (Tr. 332–3). The union took the position that it would continue to insist on agreements which other railroads had made without crew studies, particularly agreements such as had been made by railroads operating in the same terminals and alongside the CNW, such as the agreement which the Great Northern & Milwaukee had made. However, the union agreed to the recess desired by CNW to make its crew studies. Tr. 275–278.

37. The CNW and Union representatives next met on June 18, 1969 with two Mediators—Glover and Willetts. CNW had completed its studies of 45 of the 50 crews. The union was aware of the crews which CNW had studied but again questioned the worth of the studies in view of what agreements other railroads had made. The union then submitted a written proposal which its representatives stated was based on its own study of the crews.

38. The union's proposal (PX 16) was for main line local freight crews to consist of a minimum of a conductor and three trainmen; for other main line freight crews to consist of a minimum of a conductor and two trainmen; for yard crews to consist of a foreman and two helpers and for suburban passenger crews to consist of a minimum of a conductor and one trainman on trains of three or less cars and a conductor and two trainmen on trains of four or more cars, which was considered to conform to a national pattern of increasing 98% of crews in which only a trainman or helper had been employed to two trainmen or two helpers. (J. R. Wolfe Aff. 33, Tr. 280–282, 285–286). The Mediators then asked for a proposal by CNW.

39. The CNW submitted its first written proposal to the union pursuant to the suggestion of the Mediators, on June 20, 1969. It was for a continuation of the authority CNW had obtained pursuant to the Award of Arbitration Board 282 to employ a foreman and one helper to be continued in yard and branch line crews, except for five yard crews in which a minimum of a foreman and two helpers would be required and crews employed on three branch lines would be a minimum of a conductor and two trainmen; that 63 yard crews in which two helpers had been employed be reduced to a minimum of a foreman and one helper; that the crews on 30 way freight or switch run crews, which had consisted of a conductor and two trainmen be reduced to a conductor and only one trainman, for all crews employed in main line through freight trains making less than five pickups or setouts to consist of a minimum of a conductor and only one trainman.

40. The proposal would have authorized the CNW to employ only one trainman or helper in 350 to 400 crews outside Wisconsin, although it had authority, pursuant to the Award of Arbitration Board 282 to employ only one trainman

or one yard helper in only 215 crews outside Wisconsin. It also provided for arbitration of any future dispute with respect to changes in the number of persons to be employed in any crew. That proposal was discussed and rejected by the union. J. R. Wolfe, Aff. 34 Tr. 291, 302–303, 351–358.

41. On June 23, 1969 Mediator Willets and CNW's Wolfe had some private discussion and Mediator Willets handed Wolfe a second proposal by the union (PX 17). That proposal was a concession from the union's first proposal (Tr. 289) and was for all yard crews to consist of a minimum of a foreman and two helpers except for eight crews in which only one helper should be employed, for all road crews to consist of not less than a conductor and two trainmen except that the crews employed on way freight trains operating between three specified points should consist of a conductor and three brakemen and for crews on passenger and suburban service to consist of a minimum of a conductor and two brakemen except crews on trains of three or less cars which should consist of a conductor and only one brakeman.

42. On June 25, 1969 with Mediator Willets the proposals of the Union and CNW were discussed at length—each party explaining why it could not accept the other's proposal. CNW brought up the absence of a proposal by the union to change main line crews saying the Award of Arbitration Board 282 did not go far enough with respect to changes in main line crews. The union took the contrary position and would not discuss changes in main line crews. J. R. Wolfe Aff. 35, Tr. 285, 289, 303–304.

43. On June 30, 1969 CNW made its second proposal to the Union (PX 20). It was a concession from its prior proposal (Tr. 365) and was that it should continue to have the authority which it had acquired pursuant to the Award of Arbitration Board 282 except that five yard crews in which one helper was employed be increased to two helpers, that five yard crews in which two helpers were working be reduced to one helper, that three specified branch line crews in which only one trainman was required to be increased to two trainmen that the crews on three other trains in which a conductor and two brakemen were employed be reduced to one brakeman and for arbitration of any dispute as to future changes in any crews. PX 20, Tr. 260–262. It was rejected by the union; one of the grounds was the proposal for arbitration Tr. 296–299.

44. On July 1, 1969 the union submitted its third written proposal to CNW, it was the same as the union's second proposal except that it added three additional yard crews to consist of a foreman and only one helper (PX 18) and thus proposed 175 yard crews consisting of a minimum of two helpers and five crews to consist of only one helper (PX 18). CNW acknowledged it was a retreat by the union but still was well above the 80% of the crews which the Union's General Chairman Maloney originally offered, Tr. 22, 287, 363–364. Also on the same day CNW submitted its third written proposal to the Union (PX 21). It was the same as CNW's second proposal but omitted any provision for arbitration of future disputes concerning the consist of crews, Tr. 290, 364. CNW also submitted four other proposals, PX 22, proposing arbitration of the consist of all train and yard crews, PX 23, which was a request for the union to state what work rules it would be willing to trade for an agreement by CNW to add a second man to crews in addition to those which CNW in its proposal #3 offered to increase from one to two road trainmen or yard helpers and its proposal No. 6 for the union's crew consist demand to be held in abeyance for one year and for the union not to serve new crew consist demands except by mutual agreements or through regional or national handling in return for a five day work agreement for employees in suburban service upon specified conditions which should not be subject to change for three years.

45. CNW and the union met with one or both mediators on four days between

June 26 and July 2, 1969. The CNW crew studies and pros and cons of crew consist studies and the proposals of the parties, including the union's proposals of an agreement like agreements on other railroads had made particularly the Milwaukee and Great Northern were discussed and argued and each party rejected the proposals of the other. On July 2, 1969 the union handed a letter to Mediator Glover confirming the exchange and thorough discussion of the several proposals, that the union diligently strove for a settlement but the CNW proposals evidenced a backward position and were unacceptable and that the parties were hopelessly deadlocked but that the union would comply with any decision the Mediator might make. PX 25. Later that day Mediator Glover announced that mediation had failed. J. R. Wolfe Aff. 36, Tr. 304–308.

46. Voluntary arbitration was proffered by the NMB on October 10, 1969 which the CNW accepted and the Union rejected (Tr. 310–311) and on October 16, 1969 the NMB terminated its jurisdiction of the dispute. DX 7.

47. On November 10, 1969 the Union's Vice President Tuffley asked CNW's Vice President Wolfe to resume negotiations. Wolfe said he would not care to bargain under the threat of a strike and Tuffley assured Wolfe there would be no strike while negotiations were in progress and they agreed to and did resume negotiations commencing November 12, 1969 which continued thereafter every day through November 18, 1969. During the first two days they identified all the crews on the CNW System which CNW had been authorized to man with less than a conductor and two trainmen on road service and less than a foreman and two helpers in yard service and which of them were in fact working with two trainmen or helpers with a conductor and with less than two trainmen in road service and a foreman and with less than two helpers in yard service. DX 2 and 3. Main line crews which were not subject to change under the Award of Board 282 were not listed

because Tuffley said he was not willing to discuss them. J. R. Wolfe Aff. 37, Tr. 318–21, 329). During the six days of negotiations Wolfe and Tuffley discussed all of the 216 crews the CNW had been authorized to reduce under the Award of Board 282 and the positions of the parties with respect to changes in the number of persons to be employed in those crews. The result of those discussions was that the union wanted all but 36 crews to be increased from one to two road trainmen or yard helpers which CNW considered was consistent with General Chairman Maloney's original demand that 80% of the crews employed on the CNW "Proper" District consist of not less than two road trainmen and two yard helpers. J. R. Wolfe Aff. 37, DX 3 and 4; Tr. 314, 316–318–321, 329, 331.

48. Commencing on September 9, 1971 after this case was remanded by the Supreme Court, CNW and the union have engaged in 32 formal negotiating conferences, S.Tr. 15.

49. At the outset the union agreed to CNW's proposal to negotiate with respect to every crew employed by CNW in main line, branch line and yard service upon criteria such as work done by each crew, safety and other, such as the guidelines established by Board 282, irrespective of the percentage of crews which other railroads had agreed to increase from one to two or more trainmen. The union also agreed to consider in the negotiation and its conclusion as to whether a crew should consist of less than two trainmen or two yard helpers additional pay for persons employed on crews of less than two road trainmen and two yard helpers. It was then agreed that CNW would prepare a list identifying all the crews it employed, what each crew did and which of the crews it was authorized to work with less than two trainmen or yardmen and furnish that information to the union's negotiators, with a statement of CNW's position with respect to what should be the consist of the crew after which the union would present its position with

respect to each crew. S.Tr. 16–18, 74–77, 125–126, 223–224, 249–253.

50. CNW commenced preparing a list of the crews employed first yard crews, and branch line, local and way freight crews and then main line through and local crews. As the lists were completed they were submitted to the union's representatives on September 15, 16 and 17 who checked them and any questions were resolved and by September 20, 1971 the parties had agreed to the accuracy of the total number of crews and the service in which they were employed, as stated in paragraphs Nos. 4 and 5 of these findings. S.Tr. 91–94, 223–233.

51. While the parties were verifying the identification of crews the union asked CNW what about the sharing of savings from crews which might consist of less than two trainmen or yardmen and how much the CNW was considering and whether it would be part of the basic pay of the employee and CNW replied about $4.00 for conductors and $3.00 for trainmen. S.Tr. 95, 250–251.

52. On September 21st (S.Tr. 94, 118, 233) the CNW commenced its presentation with respect to yard crews. CNW stated what work the crew did, whether it was a transfer job, hump work, flat switching, industry switching and whether the work done by the crew was the same or a different type of work from time to time (S.Tr. 78–85) and what it considered the consist of the crew should be, either two or one helpers. After CNW completed its presentation as to yard crews it then proceeded with its presentation of the work of road service crews, through freight, local and way freight on branch and main lines and on October 1, 1971, 7 or 8 conference days later, CNW completed its presentation with respect to all 808 crews including 221 crews in Wisconsin. S.Tr. 118–127, 233, 236.

53. During the CNW's presentation the union took issue with and argued with CNW's statement of facts and its conclusions with respect to certain crews and agreed as to others. S.Tr. 123–26, 239.

54. The union then made its presentation in about five conference days commencing on October 4, 1971 and completing it on October 8, 1971. S.Tr. 137, 139. At the outset the union suggested that, although all 808 crews had been discussed during CNW's presentation, including 221 which worked in Wisconsin, since those employed in Wisconsin could not effectively be changed because of the Wisconsin law, that the union's presentation be limited to crews employed outside Wisconsin, to which CNW agreed. S.Tr. 236–237. Also, the union stated that, since CNW's total position was for 436 out of 587 crews employed outside Wisconsin to consist of less than two road trainmen or two yard helpers and for the other 151 should consist of two helpers, the union's presentation would be limited to those 436 and that the union's position would be presented by its general chairmen and local chairmen on the basis of the personal knowledge of the work done by those crews. S.Tr. 128, 237–238.

55. Throughout the negotiations the union was represented by its Vice President Tuffley; General Chairman Maloney who represents CNW's conductors, trainmen and yardmen, employed on CNW Proper, the former Chicago Great Western and the former Minneapolis & St. Louis and by General Chairman Roessler who represented trainmen and yardmen on the former Chicago, St. Paul, Minneapolis & Omaha. S.Tr. 219–220. The Union discussed each of the 436 crews which worked outside Wisconsin and which the CNW, in its presentation, proposed should consist of less than two trainmen or yardmen. The union agreed with CNW's position on some crews and stated their objections and the reasons for their objections for certain crews to consist of not less than two trainmen or yardmen. From time to time CNW representatives raised objections and expressed their views in opposition to the

union's position on particular crews as the union had done during the CNW's presentation. To further substantiate its position and that of its general chairmen, the union produced six local chairmen, two of them formerly had been General Chairmen, R. E. Stahley, formerly had been General Chairman on Chicago Great Western, representing all employees on the Chicago Great Western and is now a local chairman representing CNW employees in Minneapolis-St. Paul; R. E. Stanley, who had been General Chairman on the Minneapolis & St. Louis and is now a local chairman and five other local chairmen, representing roadmen and yardmen in the Galena Division of CNW, including Chicago Freight Terminal, Peter Kozoyad and David Gray representing roadmen and yardmen employed in CNW's Wisconsin Division, R. J. Keller who represents yardmen in the Chicago Freight Terminal, W. A. Burke of Boone, Iowa and his brother William Burke, both of whom represent roadmen and yardmen in Iowa. S.Tr. 240–242. Those representatives of the union stated arguments for the union's position and their objections to CNW proposals and the reasons for each with respect to particular crews in addition to those stated by the union's general chairmen Maloney and Roessler. S. Tr. 128–133, 239–240. CNW acknowledged that the union's representatives who participated in the discussion had the opportunity and experience to have knowledge of the work done by the crews involved. S.Tr. 130.

56. The discussion of main line crews was more thorough than the discussion of other crews. S.Tr. 139. The union's reasons for not agreeing to CNW's proposal for changes in main line crews were that through freight trains required constant observation by two men, one on each side of the caboose, because such trains are long and operate at high speeds and by having constant observation on both sides at the rear, brake rigging that might drop down, loads shifting, hot boxes which cause journals to burn off, could more readily be detected, particularly at night and in snow and dust and damage and injury could be prevented; also that draw bars and air hose which break could more readily be found and repaired; that such trains consist of blocks of cars and present more and dangerous difficulties for the crew in picking up cars to be added to a block of cars at intermediate stations. S.Tr. 58–59, 264–274. CNW acknowledged that brake rigging does drop down and drags under the car, that hot boxes do develop and journals do burn off and that air hoses and draw bars do break, as claimed by the union. S.Tr. 139–144.

57. At the conclusion of the presentations by CNW and by the union, every crew had been discussed and the views of each had been stated with respect to each crew. S.Tr. 133.

58. Almost every day, from the beginning of negotiations on September 9, 1964 the question of additional pay for employees working in crews of less than two trainmen or yardmen was discussed, but CNW made no definite money proposal until October 8, 1964, S.Tr. 95–106, 252–254. At some point in the negotiations CNW renewed its 1968 offer to pay an additional $3.45 to employees working in crews of less than two trainmen or yardmen rather than to increase the number of men in crews was confirmed and rejected by the union. S.Tr. 60, 96. On September 16 and 17, 1971 CNW suggested paying an additional $4.00 to conductors and $3.00 to trainmen working in crews of less than two trainmen and that the amount might be increased depending on how many one trainmen crews should be agreed upon but did not answer the union's question whether the additional amount would be part of basic pay of the conductor and trainmen, S.Tr. 95–96, 245, 252–254. At some point the union also asked CNW if it would agree to a rule such as contained in the agreement between the former Milwaukee & St. Louis and the ORC&B for a conductor working without a trainman to be paid what the absent trainman would have made was discussed and labeled a "bastard" rule by CNW and was not a sharing such as

CNW was talking about with respect to crews in which less than two trainmen should be employed. S.Tr. 102–105.

59. On October 16, 1971 CNW presented its first proposal to the union. It did not deal with crews employed in Wisconsin although those crews had been discussed it also had been agreed during negotiations that since those crews could not be changed because of the Wisconsin law the parties would deal only with crews employed outside Wisconsin and its proposals excluded those crews. S.Tr. 23–26. The proposal was that out of 144 main line crews which had not been subject to change under the Award of Board 282 to consist of less than two trainmen and for 109 branch line crews or 37 more than the 72 authorized by Board 282 to consist of less than two trainmen and for 183 yard crews or 40 more than authorized by the Award of Board 282 consist of less than two helpers and thus CNW to be authorized to employ less than two trainmen or yardmen for a total of 436 crews or 221 more than the 215 it was authorized to work with under the Award of Board 282 less than two trainmen or yardmen. S.Tr. 28–32.

60. The proposal with respect to the number of crews was made verbally, the remainder of the proposal is PX 26 which provided for the payment of an additional $4.00 to be paid to yard foremen and $3.00 to yard helpers working in a crew of less than two helpers and an additional four cents per mile to be paid road conductors and an additional three cents per mile to be paid road trainmen for each mile over 100 which they worked in crews of less than two trainmen. It also contained provisions for pay for employees desiring to terminate their employment and for protection of employment of those who continued in service, etc., S.Tr. 29030, 34–36, 106. The CNW's first proposal was discussed in detail. S.Tr. 260.

61. On October 22, 1971 the union made its first proposal DX 8, S.Tr. 30–31, 261. It was for all road crews to consist of a conductor and two trainmen and except for 28 branch line locals and way freight, crews to consist of only one trainman and for all yard crews to consist of a foreman and two helpers except 31 identified yard crews or a total of 59 crews to consist of less than two road trainmen or two yard helpers. S.Tr. 261–262. The reasons the union made no proposal with respect to main line crews were those mentioned in paragraph 56 of their findings which were discussed with CNW. S.Tr. 264–275, 139–145, 148–149.

62. On October 23, 1971 CNW made its second proposal. It was for 211 road crews to consist of less than two trainmen and 171 yard crews to work with less than two helpers. PX 27, S.Tr. 30–31, 150.

63. On November 9, 1971 CNW made its third proposal which was for 172 road crews to consist of less than two trainmen and 152 yard crews to consist of less than two helpers. PX 28, S.Tr. 37.

64. On November 11, 1971 the union verbally proposed an agreement that, since CNW was actually using two trainmen or yardmen on 35 of the 215 crews it had been authorized to reduce under the Award of Board 282, 90 of the remaining 180 crews, to be selected by CNW, immediately be restored to two road trainmen or yard helpers and negotiations continue with respect to the remaining 90 for a period of time to be agreed upon, an agreement similar to the Jacksonville agreement. CNW considered it overnight and rejected it. S. Tr. 153–158, 275–279.

65. On November 12, 1971 CNW presented its fourth proposal (PX 38, S.Tr. 38) which was for 142 road crews and 135 yard crews or a total of 324 crews to consist of less than two trainmen or yard helpers, PX 28, S.Tr. 38, 161.

66. After CNW's proposal was discussed, the union verbally proposed a variation of the "Jacksonville Agreement" and was for half of the 215 crews CNW was authorized, under the Award of Board 282, to work with less than two trainmen or yardmen or 107 or 108 im-

mediately to be increased to two road trainmen or yard helpers and for negotiations to continue for a period of time as to the remaining 107 or 108 and thus added 17 more crews for further negotiation. As the union saw it, with the 59 crews it had offered to agree should be less than two road trainmen or yard helpers and the 32 crews CNW was manning with two trainmen or yardmen although authorized to man them with only one, the crews for further negotiation would be much less. It was rejected by CNW. S.Tr. 161–163, 280–282.

67. On November 15, 1971 CNW made its fifth proposal (PX 30, S.Tr. 161–163) which was for 63 main line crews and 51 branch line road crews or a total of 114 road crews and 100 yard crews or a total of 214 crews consisting of less than two trainmen or two yard helpers. PX 31–32.

68. During the discussions of the proposals of the parties between October 17, 1971 and November 15, 1971 there were further discussions of what money the CNW would pay men working in crews of less than two trainmen and two yardmen. CNW's offer of $4.00 for road conductors and yard foremen and $3.00 for road trainmen and yard helpers was in connection with its November 9, 1971 proposal for 436 crews to be less than two trainmen and yardmen and after that the union's General Chairman Maloney asked how much more CNW would pay to which CNW replied it would depend on how many of the 436 crews the union would agree to consist of less than two road trainmen or yard helpers, S.Tr. 168. The union's General Chairman Maloney suggested $15.00 each for the road conductor or yard foreman and one trainman and one yardman to which CNW agreed but then the union said there were other considerations such as safety and the subject was not pursued. That money was offered on the condition that 436 jobs would be operated one and one. S.Tr. 168–172, 254–258.

69. On November 17, 1971 CNW made its proposal number six. It gave the union an option which basically was for CNW to retain the authority it had obtained to employ less than two trainmen in road service and less than two helpers in yard service in 214 or 215 crews for the establishment of a procedure for studying the crews thirty at a time and if no agreement should be reached for arbitration of the dispute until an agreement should be reached as to all or part of the crews or the size of the crews determined by arbitration. The proposal was rejected by the union on November 18, 1971. PX 31, S.Tr. 39–42, 283–288.

70. CNW by its refusal to meet and negotiate with UTU's predecessor BRT with respect to Section 6 notice served by UTU's predecessor in June, 1965 and its conduct during the pendency of and since the decision of the *Akron & Barberton Belt* and *Atlantic Coast Line* cases demonstrated an intent not voluntarily to make an agreement with the union prior to September 9, 1971.

71. CNW first refused to meet until the Awards of Arbitration Board No. 282 had expired. Such refusal was held to violate the Railway Labor Act and Section 8 of the Norris-LaGuardia Act in BRT v. Akron & Barberton Belt R. Co., D. of Col. 385 F.2d 581, 599, 613 (1967). It then insisted on only national negotiations. This insistence was rejected in BRT v. Atlantic Coast Line R. Co., D. of Col. 383 F.2d 225, 229 (1967).

Notwithstanding the *Atlantic Coast Line* case, CNW maintained its position that individual agreements were invalid because the crew consist dispute should have been resolved by a single National agreement. (Tr. 415–418). At the same time in its negotiations with the union, subsequent to the decision of the *Atlantic Coast Line* case, CNW has refused to consider or give any credence to agreements made by other individual railroads with the union even though CNW considers such as establishing a "National Pattern". It also has refused to consider

or give any weight to agreements affecting railroad operations in the same terminals with the CNW (S.Tr. 18) and, instead, has insisted on negotiating with the union on a crew by crew basis upon the basis of its studies of the work of each CNW crew.

72. The union, since its predecessor BRT served its notices on CNW and its predecessors in pursuance of Section 6 of the Railway Labor Act, in its negotiations with CNW since September 9, 1971 has negotiated with a genuine intent and desire to obviate CNW's objection to its negotiations and voluntarily to reach an agreement with CNW resolving the crew consist dispute arising from the union's aforementioned notice and the notice served by CNW and its predecessors pursuant to Section 6 of the Railway Labor Act in December, 1965.

73. In its Findings of Fact and Conclusions of Law of August 13, 1971, the court found that in the prior negotiations between the parties defendant union at all times (a) refused to negotiate over the carrier's proposals to reduce the size of mainline crews; (b) refused to negotiate over the carrier's proposals to settle the crew consist dispute by an agreement that would involve the payment of additional compensation to employees working on crews of one conductor and one brakeman; and (c) refused to negotiate any agreement that deviated substantially from the pattern of agreements reached with other railroads requiring approximately 95% of all crews to be operated with a minimum of one conductor and two brakemen. (Findings of Fact Nos. 11, 14, 15, 21; Conclusion of Law No. 3).

74. After the Court's decree of August 13, 1971, the parties conducted a series of 32 negotiating conferences between September 9 and November 17, 1971. (Testimony of J. R. Wolfe, Tr. 16, 26, 43, 72–74, 93–94, 118–126).

75. The carrier's proposals, contained in its original bargaining notices under Section 6 of the Railway Labor Act (45 U.S.C. § 156), generally called for unilateral determination by the carrier of the size of crews. During the negotiating conferences referred to in Paragraph 74 above, the carrier made six successive offers to settle the dispute. The substance of those offers was as follows:

(a) Of a total of 808 road and yard crews, 435 would be operated with a minimum of one conductor and one brakeman, to whom would be paid an additional $4.00 and $3.00 per day, respectively.

(b) Of a total of 808 road and yard crews, 382 would be operated with a minimum of one conductor and one brakeman.

(c) Of a total of 808 road and yard crews, 324 would be operated with a minimum of one conductor and one brakeman.

(d) Of a total of 808 road and yard crews, 277 would be operated with a minimum of one conductor and one brakeman.

(e) Of a total of 808 road and yard crews, 214 would be operated with a minimum of one conductor and one brakeman.

(f) Of a total of 808 road and yard crews, all crews would be operated with a minimum of one conductor and two brakemen except for the 214 that the carrier had identified in its last previous offer or the 215 presently authorized to operate with less than two brakemen. The union could opt whether initially the 214 or the 215 crews should be manned with less than two brakemen. Then, the union could secure negotiation and, if that failed, binding arbitration, as to whether the crews manned with less than two brakemen should be manned with two brakemen. (Testimony of J. R. Wolfe, Tr. 21, 30–42, 60–61; testimony of Francis D. Tuffley, Tr. 246–49, 259–61, 274–75, 279–80, 282–87).

76. The union's proposals, contained in its original bargaining notices under Section 6 of the Railway Labor Act, generally called for a minimum crew consist of one conductor and two brakemen on all crews. During the parties' negotiations prior to the commencement of this

action, the union offered to settle the dispute by an agreement requiring all but 48 out of 750 crews—93.6%—to be operated with a minimum of one conductor and two brakemen. During the parties' negotiating conferences referred to in Paragraph 74 above, the union made two offers, the substances of which were as follows:

(a) All but 59 out of 808 crews—92.7%—would be operated with a minimum of one conductor and two brakemen.

(b) The parties would agree to the so-called "Jacksonville formula," under which one-half of the existing, or authorized crews with a minimum of one conductor and one brakeman would be augmented shortly by an additional brakeman, with the balance of the "one-and-one" crews subject to negotiation for a further specified period of time before the parties would be free to engage in self-help if unable to arrive at an accord. This formula, which was agreed to by other railroads under strike or threat of strike, has in the past resulted in final agreements under which approximately 95% of all crews are to be operated with a minimum of one conductor and two brakemen. (Testimony of J. R. Wolfe, Tr. 20–22, 42–52, 65–66, 134–35, 153–62; testimony of Francis D. Tuffley, Tr. 261–63, 272, 275–82, 308–09, 312–14).

77. In addition to the offers of the parties discussed in Paragraphs 75 and 76 above, one of the union's General Chairmen on the carrier offered an agreement by which 435 out of 808 road and yard crews could be operated by the carrier with a minimum of one conductor and one brakeman, provided the carrier paid $15 per day to each of the two men in these smaller crews. When the carrier accepted that offer, the union's national Vice President nevertheless refused to permit any agreement to be made on that basis. (Testimony of J. R. Wolfe, Tr. 61–63, 112–13, 116–17, 168–71, 191; testimony of Francis D. Tuffley, Tr. 256–57, 299–302). The Court finds neither side seriously considered this offer. It was mere dickering between the parties.

78. At no time during the negotiating conferences referred to in Paragraph 74 above did the union offer to permit a single mainline crew to be operated with a minimum of one conductor and one brakeman. (Testimony of J. R. Wolfe, Tr. 47, 53–59, 173; testimony of Francis D. Tuffley, Tr. 263–64, 302).

79. The defendant union consistently took the following positions:

(a) that it would not agree to any proposal by the carrier for reductions in the size of mainline road crews;

(b) that it would not agree to any proposal by the carrier which included additional compensation to men working on crews of one conductor and one brakeman; and

(c) that it would not agree to any proposal by the carrier which deviated substantially from the pattern of agreements reached with other railroads requiring a minimum of one conductor and two brakemen on approximately 95% of all crews. (Testimony of J. R. Wolfe, Tr. 19–22, 43–55, 58–67, 109–13, 116–17, 134–35, 153–62, 168–71, 173–74, 191, 207–08; testimony of Francis D. Tuffley, Tr. 256–57, 275–82, 288–89, 301–02).

80. At the conclusion of the negotiating conferences referred to in Paragraph 74 above, the carrier requested the union to join with it in asking the National Mediation Board to assign a mediator to resume mediation in this dispute. The union refused. (Testimony of Francis D. Tuffley, Tr. 287–88, 292).

81. This Court has taken evidence and made these extensive and detailed findings of fact for the reason that this is a case of first impression, it being the first occasion when the Supreme Court or any other Court has decided that a District Court has the obligation of going behind the negotiations of a union and a railroad after mediation efforts have been exhausted.

It is clear that in this case neither of the parties bargained in good faith prior

to September 9, 1971. Each took its position and refused to change its position. There was little communication between the parties. Each assumed that the other was completely in error. Each assumed that its position was correct. When the cause first came before the Court in 1969, this Court assumed that the question of good faith bargaining was to be determined by the mediator assigned to the case, as the law had always been construed up to that time. The Supreme Court held that the parties were required to bargain in good faith and that if either party charges that the other has not done so that the trial court must hold a hearing and make a finding of fact upon the question before either party may resort to self-help in this case. The Supreme Court thereupon returned the cause to this Court for such a hearing. The parties proceeded to begin bargaining on September 9, 1971 and continued until the present time.

82. In the original hearing before this Court each of the parties had introduced evidence concerning the facts about bargaining between the parties before and after NMB withdrew from mediation. This Court, in accordance with the law as it was at that time found that the defendant union has served the section six (6) notice under the Railway Labor Act and had engaged in extensive negotiations with the plaintiff railroad and that NMB had terminated its services more than thirty (30) days prior to the notice of defendant that the members, the employees of the plaintiff, intended collectively to withdraw peacefully from employment by plaintiff until their demands under said section six (6) of the National Railway Labor Act were acceded to.

After making that finding of fact this Court concluded that the defendant union had in every way conformed to all of the provisions of the National Railway Labor Act that it was lawfully entitled to resort to self help and withdraw its members peacefully from the employment of the plaintiff railroad, or to put it more realistically to call a strike.

The plaintiff railroad had charged that the defendant union had not bargained in good faith as required by section two (2) of the National Railway Labor Act. The defendant union had denied the charges and answering had charged that the plaintiff railroad had not bargained in good faith under said section two (2) of the National Railway Labor Act. The plaintiff railroad replied and denied defendant union's counter charge.

The Court took evidence from the parties on the charges and counter charges of the parties.

This Court considered that the question of good faith bargaining was for the National Mediation Board, and that since it had terminated its services that this Court was barred from granting an injunction upon that question or any other under all of the facts before the Court, and that therefore the Court was without jurisdiction to issue an injunction against the defendant union prohibiting it to strike pursuant to the Norris-LaGuardia Act, 29 U.S.C. § 101 et seq. Accordingly this Court dismissed plaintiff's complaint for want of jurisdiction.

83. When the Supreme Court heard the case it did not have before it any of the record of the hearings before this Court upon the issue of good faith bargaining. It therefore reviewed only this Court's order in which it denied plaintiff railroad's prayer for an injunction against defendant union calling a strike against plaintiff railroad.

Upon receiving the mandate from the Supreme Court ordering this Court to reinstate the complaint, the court reinstated said complaint and called the case for further proceedings.

84. The cause came on for hearing upon August 13, 1971. The Court called upon the plaintiff railroad to offer evidence in support of its charge that defendant union had not bargained in good faith. The plaintiff stated that it had no evidence to present but chose to rely upon the evidence adduced before this Court prior to December 11, 1969, the date up-

on which this Court had entered its final decree dismissing plaintiff railroad's complaint. The Court then called upon defendant union and gave it an opportunity to present evidence. The defendant union likewise stated that it had no evidence to present but chose to rely upon the record of the evidence produced prior to December 11, 1969. The Court then considered the record of the testimony heard by it prior to December 11, 1969. Argument by both parties was heard by the Court.

■ 85. The Court observed and now notes that the Supreme Court laid down no guidelines as to how this Court should proceed, but merely ordered a hearing as to whether there had been good faith bargaining. This Court considered, however, that the Supreme Court had impliedly ordered this Court to order good faith bargaining, if it found that such had not occurred, and that the Supreme Court did not by implication order or suggest that if the Court found that there had not been good faith bargaining that this Court should grant a permanent injunction or order the National Mediation Board to resume mediation. The Court further concluded that the question of good faith bargaining was not before the Supreme Court but only the question as to whether plaintiff railroad had a right to raise the issue of good faith bargaining in the original hearing before this Court and to have a hearing thereon. On the other hand this Court was and is fully aware from the total record before it that neither of the parties at the time of the original hearing before this Court had bargained in good faith and that all of the issues between them had not been fully explored.

86. Accordingly, this Court, after considering all of the evidence and argument of counsel, did on August 13, 1971 enter a preliminary injunction herein restraining defendant union from calling a work stoppage or strike by employees of plaintiff railroad and ordering good faith bargaining to begin on or before September 9, 1971.

■■ 87. After a full hearing upon the bargaining between the parties as in the findings herein set forth, the Court finds that both parties have devoted much time and effort to reach an agreement and that both parties have done so in good faith. The Court finds that the plaintiff has made more concessions in the negotiations than the defendant. However, the Court does not find that to be the sole criterion of good faith bargaining. The Court cannot find that a party to a controversy is acting in bad faith on all occasions merely because it refuses to change its position, when its position may very well be 100 per cent correct in the beginning, which this Court does not find to be the case.

■ 88. The Court finds that if good faith bargaining should be held to require each party to modify its position until an agreement is reached, that in effect would abolish the right of either side to resort to self help. That would contravene and defeat the very statute involved herein and empower this Court to arbitrate the controversy. Only Congress has the jurisdiction to grant this Court such power.

89. The Court finds that the purpose of the mandate of the Supreme Court to this Court in the instant case was to hold hearings and ascertain that no hasty action was taken until the controversy had been fully and carefully considered and negotiated by the parties. That the Court has done and the parties have negotiated in good faith since September 9th, 1971, and this Court no longer has jurisdiction to restrain the defendant union from calling a strike except pending appeal from the Court's final decree herein.

## CONCLUSIONS OF LAW

1. This action arises under Section Two (2) First of the Railway Labor Act (45 U.S.C. § 152 First), and the Court has jurisdiction of the action under 28 U.S.C. §§ 1331 and 1337.

2. Section Two (2) First of the Railway Labor Act (45 U.S.C. § 152 First)

requires "all carriers, their officers, agents, and employees to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes . . . in order to avoid any interruption to commerce . . ."

3. This action arises out of and involves a labor dispute within the meaning of the Norris-LaGuardia Act, 29 U.S.C. Section 101, et seq.

4. Following remand by the Supreme Court, 91 S.Ct. 1731, 29 L.Ed.2d 187, this Court entered a Decree on August 13, 1971, D.C., 330 F.Supp. 646, and since the entry of the Decree the union has fully complied with its duties under the Railway Labor Act; has demonstrated that it has negotiated in good faith and is, therefore, entitled to resort to self-help and to call a strike upon the giving of reasonable notice.

5. The union has complied with Section Two (2) First of the Railway Labor Act (45 U.S.C. § 152 First) in its negotiations and has satisfied this Court's Decree in the following specific respects:

(a) the union has negotiated with the carrier over the carrier's proposals to reduce the size of main line freight crews;

(b) the union has negotiated and has permitted its negotiators to engage in these negotiations with the carrier over the carrier's proposals to settle the crew consist dispute by providing additional compensation to certain employees working on crews of one conductor and one brakeman;

(c) the union has negotiated on a crew by crew basis and has not insisted, or requested, that the carrier conform to any agreement or agreements made on other railroads but has insisted that the agreement conform generally to the union's agreements with other railroads were there exist conditions similar to those existing on plaintiff railroad;

(d) it did not constitute bad faith bargaining for the defendant union to refuse to enter into any agreement with plaintiff railroad which did not contain provisions generally similar to those of all other railroads with defendant union concerning crew consist, even if the union did not materially modify its original demand for such agreement.

6. The railroad failed to comply with its duty under Section Two (2) First of the Railway Labor Act since the inception of the crew consist dispute in 1965. It's refusal to meet or negotiate on the ground that the union's notice was premature was condemned by the Court of Appeals which also squarely held that such conduct violated Section 8 of the Norris-LaGuardia Act. BRT v. Akron & Barberton Belt R. Co., D. of Col., 385 F.2d 581 (1967). Plaintiff railroad's conduct since the refusal to bargain has now been such as to purge it of its refusal to negotiate within the meaning of Section 8 of the Norris-LaGuardia Act.

7. The conduct of the defendant union in its negotiations on the crew consist issue since September 9, 1971 has been one of seeking to voluntarily resolve the issues by agreement, even though it has not changed its demands materially. The conduct of the plaintiff railroad in its negotiations with the defendant union during the period since September 9, 1971 has been in good faith, even though it has not been willing to enter into an agreement similar to that which the union has reached with all other railroads.

8. The defendant union having demonstrated its good faith and its compliance with the Decree of this Court, the clean hands doctrine of Section 8 of the Norris-LaGuardia Act is once again applicable.

9. The plaintiff railroad cannot be charged with bargaining in bad faith solely because it refuses to enter into an agreement with defendant union generally similar to the union's agreement with all other railroads if the railroad in good faith believes that such an agreement is not fair to it under all of the

facts and circumstances, as the plaintiff railroad maintains there exists in the instant case.

■ ■ 10. The Court has no statutory authority to remand the controversy to the Mediation Board. That would be a useless gesture, for the Mediation Board has no statutory authority to order good faith bargaining or to determine whether either or both parties have bargained in good faith pursuant to Section Two (2) First of the Railway Labor Act. Only this Court has such authority.

■ 11. No act of Congress has authorized this Court to mediate or arbitrate a controversy between a railroad and its employees acting through a union or otherwise. Neither did the Supreme Court in its mandate authorize or empower this Court to so act.

■ 12. The requirements of the Railway Labor Act having been exhausted for more than thirty days with respect to the dispute between plaintiff and defendant arising from the notices served by defendant on plaintiff in July 1965 and by plaintiff on defendant in December 1965 with respect to the number and craft of persons to be employed by plaintiff in its train and yard crews, the Court does not have jurisdiction under the provisions of Sections 4 and 7 of the Norris-LaGuardia Act, 29 U.S.C. §§ 104, 107, to continue in force an injunction, either temporary or permanent against the defendant union striking and picketing plaintiff railroad as sought by plaintiff herein, except pending appeal.

13. The Court had jurisdiction herein on August 13, 1971, and it properly entered a Decree granting the plaintiff railroad a preliminary injunction restraining the defendant union from calling a strike by its members against their employer, the plaintiff railroad.

■ 14. The Court concludes that each of the parties are at fault for the prolonged litigation prior to August 13, 1971 and that each should bear its own costs herein to this date.

15. Plaintiff railroad's complaint and its request for a permanent injunction should be denied; defendant union's motion to dismiss plaintiff's complaint should be allowed, and an appropriate decree should be entered for such purposes.

### DECREE

This cause came on for a further hearing after remand by the Supreme Court of the United States and, in accordance with this Court's Decree of August 13, 1971, and the Court having heard evidence on November 18 and 19, 1971, and having heard oral arguments by counsel for both parties on those dates and having examined the proposed findings of fact and conclusions of law submitted by each party, and having this day made the foregoing Findings of Fact and Conclusions of Law, the Court in accordance therewith enters the following Decree:

It is ordered, adjudged and decreed that:

1. The defendant union in its negotiations with the plaintiff carrier respecting the so-called crew consist dispute arising out of the defendant's notices of July 1965 and the plaintiff's notices of December 1965 has, pursuant to this Court's Decree of August 13, 1971, complied with the requirements of Section 2 First of the Railway Labor Act (45 U.S.C. Section 152 First).

2. The plaintiff railroad has likewise bargained in good faith since September 9, 1971 and has made numerous offers to the union, in each instance reducing its demands, as set forth in the Court's Findings of Fact entered herein.

3. The union having complied with the Railway Labor Act and with the August 13, 1971 Decree of this Court (made pursuant to the opinion and mandate of the Supreme Court of the United States), now from this day forward the Norris-LaGuardia Act (29 U.S.C. 101 et seq.) is applicable herein. The Court is therefore divested of jurisdiction to issue a permanent injunction restraining the exercise of self-help by the union with

respect to the crew consist dispute. Plaintiff's motion for a permanent injunction is denied.

4. The defendant union is now free to resort to self-help and to call a strike of its members against their employer, the plaintiff railroad. The Court hereby vacates its Order of Injunction upon condition that the union may not exercise its right to strike until it has served 14 days notice upon plaintiff railroad.

5. This court no longer having jurisdiction to grant further relief to plaintiff railroad, now, therefore, the defendant's Motion to Dismiss the Complaint is allowed and the Complaint herein is dismissed for want of jurisdiction.

6. Each party shall pay its own costs herein.