REA EXPRESS, INC., Plaintiff,

v.

BROTHERHOOD OF RAILWAY, AIR-LINE AND STEAMSHIP CLERKS, FREIGHT HANDLERS, EXPRESS AND STATION EMPLOYEES, AFL–CIO, Defendant.

No. 72 Civ. 4492.

United States District Court,
S. D. New York.

April 11, 1973.

James L. Highsaw, Highsaw & Mahoney, Washington, D. C., David J. Fleming, Reilly, Fleming & Reilly, New York City, for defendant; William J. Donlon, Gen. Counsel, Brotherhood of Railway and Airline Clerks, Rosemont, Ill., of counsel.

Arthur M. Wisehart, New York City, for plaintiff; Anderson, Allegaert & Russell, New York City, Eugene Anderson, Jerold Oshinsky, New York City, of Counsel.

EDWARD WEINFELD, District Judge.

Plaintiff, REA Express, Inc. (REA), a carrier engaged in the express transportation of property by railroad, air and truck, and subject to the provisions of the Railway Labor Act,[1] and the Interstate Commerce Act,[2] commenced this action against the Brotherhood of Railway, Airline and Steamship Clerks, Freight Handlers, Express and Station Employees, AFL–CIO (BRAC), the collective bargaining representative of its employees,[3] upon two causes of action. The first charges that BRAC called a nationwide strike against REA to coerce the resignation of REA's management, the continuation of certain payments believed to be illegal and for other unlawful purposes. The complaint further alleges that BRAC's activities constitute a continuing pattern of con-

---

1. 45 U.S.C. §§ 151–188.

2. 49 U.S.C. § 1 et seq..

3. *See* § 2 Ninth of the Railway Labor Act, 45 U.S.C. § 152 Ninth.

duct in resorting to illegal strike action in violation of the no strike requirements of its agreement with REA and the Railway Labor Act. The second cause of action alleges that since April 29, 1971, BRAC has refused to bargain in good faith in that it insisted upon demands which are improper under the Railway Labor Act, including demands (a) for the abolition of the Special Board of Adjustment; (b) for preferential and discriminatory treatment of employees located in the New York area; (c) that REA's president resign; (d) that certain payments be made which are believed to be illegal; and (e) for benefits that would violate the Economic Stabilization Act.

Thereafter, plaintiff served an amended complaint setting forth a third cause of action, alleging in substance that it made its final and best offer of settlement upon BRAC's representation that this would be submitted to its membership for final acceptance or rejection by a vote; that plaintiff, in reliance upon such representation, changed its position to its detriment and to the defendant's benefit; that contrary to its representation, BRAC failed to submit the offer to its membership; that an independent vote taken of the membership indicated that a majority desired to accept REA's final proposal; that BRAC's action in ordering the strike in the light of the expressed views of a majority of its employees to the contrary constituted, not only a violation of the agreement to submit the final proposal to BRAC's membership for a determinative vote, but also a failure to exert every reasonable effort to make an agreement and to avoid a strike and the attendant interruption of commerce. Plaintiff seeks a judgment enjoining BRAC's alleged unlawful strike; it also seeks punitive damages, attorneys' fees and damages claimed to have been sustained as a result of alleged illegal or unauthorized work stoppages; also a declaratory judgment as to the propriety of BRAC's demands in collective bargaining; and finally an order directing BRAC to submit to its membership REA's final offer for acceptance or rejection.

## THE TEMPORARY RESTRAINING ORDER

After negotiations between the plaintiff's and defendant's representatives, which had been carried on intermittently over an eighteen-month period, had failed to achieve an agreement, BRAC's International President called a nationwide strike of its 16,000 members, effective on October 20, 1972. Plaintiff commenced this suit and applied for a temporary restraining order, which, after a hearing on notice to the defendant and its attorneys, was granted on October 23. In a brief memorandum, accompanying the temporary restraining order, this Court found that although plaintiff's showing of probable success was limited, its claims raised substantial and difficult issues which merited further inquiry, and that pending such inquiry the harm to plaintiff and to others warranted the temporary injunction.[4] The Court found, among other matters, that if the injunction were not granted, a strike would most likely force plaintiff into bankruptcy; also it would result in the permanent loss of jobs to thousands of its employees, the impairment of pension and other payments to many retired former employees, and inconvenience to shippers and the public at large.

## THE PRELIMINARY INJUNCTION HEARING

Thereafter, extensive testimony was received in support of and in opposition

---

4. *Cf.* Omega Importing Corp. v. Petri-Kine Camera Co., 451 F.2d 1190 (2d Cir. 1971); Weiss v. Walsh, Nos. 71-1398, 1852 (2d Cir., Oct. 29, 1971); Semmes Motors, Inc. v. Ford Motor Co., 429 F.2d 1197, 1205, 1206 (2d Cir. 1970); Checker Motors Corp. v. Chrysler Corp., 405 F.2d 319, 323 (2d Cir.), cert. denied, 394 U.S. 999, 89 S.Ct. 1595, 22 L.Ed.2d 777 (1969); Dino DeLaurentiis Cinematografica, S. p. A. v. D-150, Inc., 366 F.2d 373, 375 (2d Cir. 1966); *see also* Hamilton Watch Co. v. Benrus Watch Co., 206 F.2d 738 (2d Cir. 1953).

to plaintiff's application for a preliminary injunction. During the course of the hearings an issue arose as to a strike ballot of defendant's membership previously taken by plaintiff on its own initiative. The Court suggested and the parties agreed that a poll be taken of BRAC's members to ascertain their views as to whether they preferred to accept REA's last offer or to resume the strike, merely for informational purposes and without prejudice to the rights of the parties. Pending the balloting, during which there may have been unexpressed hopes that differences might be composed, the temporary restraining order was continued by consent. The poll, conducted under the auspices of the National Mediation Board (the Board) was not completed until February 1973, and the returns indicated that 56.4% of those voting opted for rejection of the company's offer and in favor of a strike.[5] Thereafter, the hearing on the motion for a preliminary injunction was resumed on March 22, 1973. The Court, in view of the extensive record which probed into all issues, ordered, pursuant to Rule 65(a)(2) of the Federal Rules of Civil Procedure, that the trial of the action on the merits be advanced and consolidated with the hearing on the application for the preliminary injunction.[6] Additional testimony was received on March 30, when the matter was submitted for final decision.

## THE PERIOD FROM APRIL 1, 1971 TO APRIL 6, 1972

The written agreement between the parties as to hours, wages and working conditions by its terms was to continue in effect until June 30, 1971, and thereafter until changed or modified in accordance with the provisions of the Railway Labor Act. On April 1, 1971, BRAC, under a provision of the agreement, served two notices on REA pursuant to section 6 of the Railway Labor Act;[7] the first proposed a broad range of modifications in the existing contracts as to rates of pay, hours and working conditions, and the second proposed revisions in health and welfare benefits. All changes were to become effective July 1, 1971 for a period of three years. The wage increases proposed by BRAC were 20%, effective July 1, 1971; 15%, effective July 1, 1972; and 15%, effective July 1, 1973. The notices brought into play the machinery under the Railway Labor Act, intended, among other purposes, to achieve the "prompt and orderly settlement of all disputes concerning rates of pay, rules, or working conditions"[8] between the carrier and the Union. That purpose has not been realized to date, more than two years after BRAC served its section 6 notices, and in the light of the contentions advanced by the parties a detailed chronology of events is required to set the matter in proper focus.

On April 8, 1971, REA acknowledged receipt of BRAC's section 6 notices, suggested a conference on April 29, and advised that it would at a future date serve notice of its counterproposals to be considered concurrently with those of BRAC. The parties met on April 29, at which time the ground rules were discussed, and some time was spent on BRAC's first notice. On May 28 REA served its section 6 notice of proposed revisions in the existing agreements, which were "general in nature"; on June 15 it submitted specific proposals.

Prior to the exchange of the section 6 notices, the parties were involved in a dispute as to REA's claim that it had the right unilaterally to make changes in its Over-The-Road (OTR) Operations in northeastern United States. BRAC in-

---

5. In all, 15,356 employees were polled; not all returned their ballots. 11,121 ballots were timely returned and of these, 6,268 voted to reject REA's final offer and to resume the strike, while 4,853 voted to accept and not resume the strike.

6. *Compare* Akron, C. & Y. R.R. v. International Bhd. of Elec. Workers, 237 F.Supp. 343 (N.D.Ill.1964).

7. 45 U.S.C. § 156.

8. 45 U.S.C. § 151a(4).

voked the services of the National Mediation Board, but mediation was interrupted by litigation between the parties relative to that dispute.[9] As a consequence of a Board mediator's report on the OTR mediation, on June 14, 1971 the Board docketed BRAC's section 6 notices and notified the parties that a mediator would be assigned to the dispute; each party was requested to furnish a brief statement as to the status of each item in the section 6 notices.[10] REA protested to the Board that the docketing was premature and prejudicial to REA's interest; that the dispute involving the northeast OTR runs was unrelated to the April 1, 1971 section 6 notices; in general, REA urged that the parties had not had an opportunity, as required by section 2 First of the Railway Labor Act "to exert every reasonable effort to make and maintain agreements" and settle their disputes.[11] Consequently, it requested the Board to rescind its decision to docket the case at that time. BRAC, to the contrary, urged the Board to commence immediate mediation activity.

The Board instructed the parties to appear at a conference on July 1, 1971. On July 1 and 2 meetings were held, participated in by representatives of BRAC, REA and two Board mediators. Subsequently, as agreed, private meetings were held on July 7, 8, 12 and 13, attended only by BRAC and REA representatives, at which various proposals contained in the section 6 notices were considered after being broken down into categories of (a) major economic proposals; (b) minor economic proposals; and (c) non-economic proposals. While some progress was made as to non-economic proposals, an impasse was reached with the wage increase issue, the principal stumbling block. The Union negotiators insisted that some discussion take place concerning the economic proposals before continuing negotiations on the non-economic items. REA's representatives maintained that the Company could not present any wage offer until it had secured agreement on rule changes designed to increase efficiency and to effect savings.

The management of the Company, the third and most recent in a series of changes over a five-year period, took the position that the Company was in such dire financial straits that to comply with the Union demands in any substantial measure, without working rule changes and implementation of a consolidation program, would force it into bankruptcy. The Union, then represented principally by R. J. Devlin, an International Vice President, and a negotiating committee of Express General Chairman [12] (Chairmen) were dubious that REA's financial picture was as bad as represented. They contended that the current wage rates were much below those of employees doing similar work in substantially the same industry, and that REA's employees were working at the same wage level since June 30, 1970, when an increase came into effect under the existing contract. Further, it was charged that the Company had been mis-

9. *See* REA Express, Inc. v. Brotherhood of Ry., Airline & S. S. Clerks, 459 F.2d 226 (5th Cir.), cert. denied, 409 U.S. 892, 93 S.Ct. 115, 34 L.Ed.2d 149 (1972).

10. It is of no consequence that REA's § 6 notice was not then docketed by the Board since its proposals were considered during the negotiations. *Cf.* Flight Eng'rs Int'l Ass'n v. Eastern Air Lines, Inc., 208 F.Supp. 182, 190 (S.D.N.Y.), aff'd per curiam, 307 F.2d 510 (2d Cir. 1962), cert. denied, 372 U.S. 945, 83 S.Ct. 934, 9 L.Ed.2d 970 (1963); Pan Am. World Airways, Inc. v. Flight Eng'rs' Int'l Ass'n, 306 F.2d 840 (2d Cir. 1962).

11. 45 U.S.C. § 152 First.

12. Express General Chairmen are officers of subordinate units of BRAC, known as District Boards of Adjustment, which on the property of REA consist of other officers and representatives of each BRAC local lodge within a designated geographical area containing members employed by REA. There are 16 Chairmen, one for each BRAC District Board of Adjustment on the property of REA.

managed by the present and prior executives; that a group, which most recently had acquired stock control of REA, had failed to provide necessary capital; that keeping the same wage rates meant in effect that the employees were subsidizing a private enterprise that was undercapitalized. The persistent position of REA's president that it was on the verge of bankruptcy, which in the view of the Express General Chairmen was at variance with statements contained in a letter from management to its employees, led them to suggest that the best interests of REA would be served by his resignation. Management in turn charged negotiations were stalled due to resentment by the Chairmen because of the elimination of monthly payments under what is referred to as the Merchant Agents Agreement, which management contended was illegal and the Chairmen contended otherwise.[13] The blunt fact is that the attitude of each negotiating team toward the other was not exactly that of mutual respect and confidence—to the contrary, it was one of marked hostility.

Indeed, there had been such deterioration in the conduct of negotiations that Tom Kole, the President of REA, enlisted the intervention of C. L. Dennis, the Union's International President, who thereafter played an active and leading role in negotiations. On or about July 14, 1971, the two top executives met in the presence of other representatives of each of the parties, and Kole, upon his representation that REA was financially unable to grant any wage increase, re-

quested of Dennis a fourteen-month deferment in the processing of BRAC's section 6 notices, as well as its consent to operational changes aimed to ease the financial impact upon REA of any wage increase. While these and other matters were explored, no commitment was made to defer the processing of the Union's section 6 notices.

On September 20 the Board's mediator resumed participation in the matter and conferred with the parties. On October 4, at a conference between R. J. Devlin and Stanley Aiges, REA's Vice President in charge of Labor Relations, Aiges stated that several outside groups were interested in merging with REA and buying into the Company and presented a number of proposals in the hope of getting what he termed a "quick" settlement. The testimony is in conflict as to what transpired at this meeting. Aiges testified that Devlin in effect rejected the proposals out of hand, stating that no agreement could be reached until payments under the Merchant Agents Agreement were resumed [14] and the vacation issue and the Company's consolidation plan resolved. Devlin's version is that Aiges pressed for a quick answer; that for about the eighth time he, Devlin, was told that if the proposals were not agreed to, a bankruptcy petition would be filed, or alternatively that REA would close down operations west of the Mississippi River or the New York City operation. He further testified that he informed Aiges that time was required to study the proposals with the full membership of the negotiating

13. The Merchant Agents Agreement (the Agreement) between REA and BRAC, effective March 1, 1967, settled a dispute between the parties over the status of merchant agents—individuals or business entities employed by REA to handle shipments in areas where its regular facilities had been closed due to consolidation of the Company's operations. The Union contended that these agents should be covered by the principal agreement between the parties; but REA maintained that the agents were independent contractors. Under the Agreement REA consented to pay the

National Association of Express General Chairmen $4000 each month to reimburse the Union for the loss of fees, dues and assessments it would receive if the above mentioned operations were conducted by BRAC members. Sometime in March or April 1971 the Company discontinued these payments after being advised by its counsel that such payments were illegal under the Railway Labor Act.

14. REA had stopped making the payments under the Agreement some time in March or April 1971. *See* note 13 *supra.*

committee, and that the Union did not intend to be "black jacked" into any agreement. The two contending groups met thereafter on October 12 and 13[15] and the recently advanced proposals were considered at those meetings, also attended by the mediator. Again there was a heated session without an agreement, with management stating that in the absence of an accord, it intended to take unilateral action with respect to consolidation of operations in the interests of economy, which brought a sharp protest from Union representatives, who charged any such action would constitute a violation of the existing status quo. Despite the mediators' best efforts during the July-October negotiations and meetings, no agreement was reached. One mediator was of the view that "without money" there could be no agreement.

Finally, in late October, the Mediation Board, in accordance with section 5 First of the Railway Labor Act,[16] sought to have the parties submit the controversy to voluntary arbitration, which was declined on February 8, 1972, by Devlin; this declination was confirmed on February 17 by the International President. REA failed to respond to the request for arbitration. Thereafter, on February 23, the Board, pursuant to section 5 First of the Railway Labor Act, notified the parties that its mediating efforts had failed; that in its judgment all practical methods under the Act for the adjustment of the dispute had been exhausted without effecting a settlement; accordingly, that its services were terminated. This termination of the Board's jurisdiction left the Union free to strike thirty days thereafter, on March 25,[17] unless in the intervening period the parties agreed to arbitration or an emergency board was designated by the President under section 10 of the Act.[18] Neither event occurred. However, although free to strike, no strike was then called.

Under the Union's constitution the sole authority to call a strike, once it is authorized, is vested in its International President. The authorization for a strike call may be by either a two-thirds ($\frac{2}{3}$) referendum vote of the membership of an employer, or by a three-fourths ($\frac{3}{4}$) vote of the officers and members of the System Boards[19] involved. The authorization, whichever one is brought into play, vests in the International President the sole discretion to set the strike date when in his judgment it is consonant to do so in the best interests of the employees.

Soon after the National Mediation Board made its proffer of arbitration, a difference of opinion as to the Union's course of action developed. C. L. Dennis was reluctant to set the strike machinery in motion. Robert J. Devlin and the Express General Chairmen were of the view that meaningful negotiations could not be achieved unless REA faced the reality of an immediate strike; accordingly, the Express General Chairmen not only opposed arbitration, but unanimously voted that a strike date be set, and to that end they sought authority from the International's Executive Council to call the strike. However, the Council upheld the exclusive authority of C. L. Dennis, the International President, to call a strike. REA characterizes these and other differences[20] as a schism in the

15. Previously, on October 7, Aiges, Devlin and the Board mediator met in an attempt to clarify the REA proposals of October 4.

16. 45 U.S.C. § 155 First.

17. See Brotherhood of R. R. Trainmen v. Jacksonville Terminal Co., 394 U.S. 369, 378, 89 S.Ct. 1109, 22 L.Ed.2d 344 (1969); Brotherhood of Ry. & S. S. Clerks v. Florida E. C. Ry., 384 U.S. 238, 243–244, 86 S.Ct. 1420, 16 L.Ed.2d 501 (1966); Brotherhood of Locomotive Eng'rs v. Baltimore & O. R. R., 372 U.S. 284, 291, 83 S.Ct. 691, 9 L.Ed.2d 759 (1963).

18. 45 U.S.C. § 160.

19. These are equivalent to the District Boards on REA properties.

20. Another intra-Union dispute cited by REA arose in connection with an ar-

Union leadership, which it contends foreclosed any "reasonable effort" on its part to reach an agreement—a matter discussed hereafter.

## THE APRIL 6, 1972 AGREEMENT AND SUBSEQUENT EVENTS TO OCTOBER 20, 1972, THE STRIKE DATE

As already noted, the Union, following the failure of the procedures under the Act, was free to strike on March 25, 1972. Prior to this date, Dennis, by virtue of the unanimous vote of the Express General Chairmen that a strike be called, already had authority to fix the date. However, before taking such action he decided, although not required, to solicit the views of the rank and file, advising them of the status of the negotiations and of REA's claimed financial condition. The ballots were sent out early in March. Approximately 64% of the more than 10,000 members who returned their ballots (17,000 were mailed) favored a strike. Notwithstanding that the Express General Chairmen unanimously favored an immediate strike and that 64% of the 10,000 employees who voted also favored one, Mr. Dennis' judgment was that the serious consequences of a strike to Union employees, REA and the public warranted further consideration of the section 6 problems; accordingly, he did not then fix a strike date. Instead, Dennis, acting on behalf of the Union and Kole, who obviously wanted no strike, acting on behalf of REA, on April 6, 1972, entered into an agreement under which BRAC agreed it would not strike at that time and REA agreed it would not unilaterally put into effect its proposed working conditions under its section 6 notices; the agreement was subject to unilateral and automatic termination upon ten days' notice by either side. Since the April 6 agreement, referred to at times as a "status quo" agreement, is at the hard core of the parties' respective contentions as to their relative rights, its pertinent provisions are set forth:

"    .    .    .

1. In consideration of commitments made by REA Express, as set forth in point 2 hereof, BRAC agrees that it will not at this time set a strike date against REA Express growing out of the wages, rules, or working conditions changes in dispute as a result of section 6 notices and counterproposals served by either party on and after April 1, 1971 to date of this agreement.

2. In consideration of commitments made by BRAC as set forth in point 1 hereof, REA Express agrees that it shall not place into effect, either in whole or in part, at any or all locations, any or all of the wages, rules, or working condition changes proposed in negotiations growing out of the section 6 notices and counterproposals served by either party on or after April 1, 1971 to date of this agreement provided, however, that REA reserves the right to exercise its management prerogatives with respect to application of the terms and conditions of the existing labor agreement and does not waive any such rights, including its right to apply the award issued by arbitration Board 312 in Case A 7773 on February 4, 1972, subject to its terms or any understandings with respect thereto which the parties may agree upon.

bitration award dealing with the Company's proposed plan for further consolidation of its operations. The nub of the controversy was whether C. L. Dennis, International President, had the authority to commit the Union to arbitration of the consolidation dispute by signing the arbitration agreement. This matter was the subject of litigation. *See* Catalano v. Brotherhood of Ry., Airline & S. S. Clerks, 348 F.Supp. 369 (S.D. N.Y.1972); Brotherhood of Ry., Airline & S. S. Clerks v. REA Express, Inc., 344 F.Supp. 1370 (S.D.N.Y.1972), appeal pending, No. 72–1930 (record filed Aug. 23, 1972).

3. Both parties agree to continue negotiations relative to proposed wages, rules or working condition changes.

4. This agreement may be unilaterally and automatically terminated ten (10) days from the date of the mailing of a notification by either of the undersigned to the other of such termination. Such notification shall be sent by Registered Mail, Return Receipt Requested, and the postmark on the envelope shall conclusively establish the date on which the ten day period commences.

. . . ."

Thereafter the parties met occasionally, but little was achieved. Finally, on August 22, Dennis sent a ten-day notice of cancellation of the April 6 agreement. REA responded on August 24 by giving BRAC an alleged section 6 notice of a proposed amendment to the agreement of April 6, which would have eliminated the ten-day unilateral cancellation provision and would have extended it to February 4, 1973, with an automatic self-renewal clause to govern thereafter, and for succeeding one-year periods unless thirty-day written notice of intended change were served by either; the notice also advised BRAC that further changes would be proposed at future negotiating sessions. BRAC rejected the purported section 6 notice and contended that the April 6 agreement was "automatically terminated" by its ten-day notice. Needless to say, REA contended otherwise.[21]

Although BRAC was of the view that its right to strike was intact, Dennis did not set a strike date. On August 22 he took a vote of the REA District Boards, which resulted in an almost unanimous request that he call a strike.[22] Notwithstanding, he resumed negotiations, assisted by a committee of Express General Chairmen, on the original section 6 dispute with REA. The negotiations were conducted on September 7, 8, 11 and 12, 1972, and centered about a wage increase. During these meetings REA, for the first time since BRAC served its section 6 notices on April 1, 1971, offered a wage increase, conditioned upon changes in vacation periods, health and welfare plans and other items. It was to become effective September 1, 1972, but no retroactive increase was provided for the period from July 1, 1971 to September 1, 1972. The proposal was unacceptable to BRAC's representatives. The parties met again on September 29. REA now proposed a 5.5% increase to become effective May 1, 1972, and a second 5.5% increase, effective September 1, 1973, but failed to provide for any retroactive wage increase for the period from July 1, 1971 to May 1, 1972. This proposal, stated to be a "final" offer, was rejected by BRAC's representatives. Thereupon REA was informed that October 20 was set as the strike date, but that the strike call would not be released until October 14 in order to minimize disruption of REA's business activities. Then followed still further and intensive negotiations in an effort to avert the strike. The parties conferred on October 6, 19 and even after the strike was in effect, on October 21 and 22, exploring new and alternative approaches to resolve the dispute; but despite the intervention of the Mediation Board which, in view of the public interest and the emergency situation, again had designated mediators[23] no agreement was reached.

21. REA, on October 23, 1972, wrote to the National Mediation Board requesting that its notice of August 24 be docketed. The Union later communicated with the Board opposing REA's application. The Board has taken no action to date.

22. 185 officers and members of those Boards voted in support of the request

for a strike, four against, and three did not vote.

23. Pursuant to 45 U.S.C. § 155 First. The Board specifically noted that its action was "not to be construed as a formal resumption of jurisdiction by the Board and [was] without prejudice to the position of the parties."

This long and somewhat detailed recital of events, not altogether complete, is necessary for the determination of two principal issues: (1) did the April 6, 1972 agreement void the Union's right to strike on its original section 6 notices, and, if it did not, (2) should a strike injunction be issued because the Union allegedly violated its duty under section 2 First of the Act "to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions." [24]

## THE EFFECT OF THE TERMINATION NOTICE UPON THE APRIL 6, 1972 AGREEMENT

REA concedes,[25] as indeed it must, that BRAC, with respect to the subject matter of its April 1, 1971 section 6 notices, had the legal right to strike on March 25, 1972, thirty days after the parties were notified by the Mediation Board that it had terminated its jurisdiction.[26] As shown above, the International President of BRAC, despite the unanimous judgment of the Express General Chairmen and a majority of the employees who voted in the March 6 poll, that a strike be put into effect, decided further negotiations were warranted and thus the so-called "status quo" or "standby" agreement came into being. When in the months thereafter no progress was made, BRAC gave the ten-day notice on August 22, the effect of which REA contends was nullified by giving, two days later, an alleged new section 6 notice. The parties had previously gone through the required procedures [27] under their original section 6 notices and the statutory requirements had been fully satisfied, which resulted in the Union's right to strike on March 25. As stated by the Fifth Circuit Court of Appeals,[28] and approved by the Supreme Court: [29] "[W]hen the machinery of industrial peace fails, the policy in all national labor legislation is to let loose the full economic power of each [party]. On the side of labor, it is the cherished right to strike." [30] BRAC, by its forbearance to exercise this "cherished right" while it pursued further efforts to reach a peaceful settlement, did not surrender the right, any more than REA surrendered its right to a lockout or unilaterally to put into effect upon ten days' notice "at any or all locations, any or all of the wages, rules, or working condition changes growing out of the section 6 notices and counterproposals served by either party on or after April 1, 1971 . . . . ."

REA, however, argues that the April 6, 1972 agreement itself comes within the ambit of section 6 of the Railway Labor Act, despite the intention of the parties unilaterally to terminate it at the expiration of the ten-day notice. REA claims that the termination provision was of no effect and that plaintiff (and also defendant) could, prior to the expiration of the ten days, serve a new section 6 notice and keep all conditions in place while the parties submitted to a second round of mandatory and lengthy procedures under the Act.

To sustain REA's position in effect means that it was within its power

---

24. *See* Chicago & N. W. Ry. v. United Transp. Union, 402 U.S. 570, 91 S.Ct. 1731, 29 L.Ed.2d 187 (1971).

25. Subject to its claim of BRAC's alleged violation of § 2 First.

26. *See* cases cited in note 17 *supra.*

27. *See* Brotherhood of R.R. Trainmen v. Jacksonville Terminal Co., 394 U.S. 369, 378, 89 S.Ct. 1109, 22 L.Ed.2d 344 (1969).

28. Florida E. C. Ry. v. Brotherhood of R.R. Trainmen, 336 F.2d 172, 181 (5th Cir. 1964), cert. denied, 379 U.S. 990, 85 S.Ct. 703, 13 L.Ed.2d 611 (1965).

29. Brotherhood of R.R. Trainmen v. Jacksonville Terminal Co., 394 U.S. 369, 384, 89 S.Ct. 1109, 22 L.Ed.2d 344 (1969).

30. *See* Brotherhood of Ry. & S.S. Clerks v. Florida E. C. Ry., 384 U.S. 238, 244, 86 S.Ct. 1420, 16 L.Ed.2d 501 (1966); Brotherhood of Locomotive Eng'rs v. Baltimore & O. R.R., 372 U.S. 284, 291, 83 S.Ct. 691, 9 L.Ed.2d 759 (1963); Delaware & H. Ry. v. United Transp. Union, 146 U.S.App.D.C. 142, 450 F.2d 603, 608, cert. denied, 403 U.S. 911, 91 S.Ct. 2209, 29 L.Ed.2d 689 (1971).

to delay indefinitely by the new proceeding the Union's right to self help which had matured on March 25, 1972. It is clear that neither party contemplated that the procedures of the Act could again be brought into play if one or the other gave the ten-day notice of cancellation so explicitly stated in their agreement. The rights that accrued to each upon the expiration of the Mediation Board's thirty-day notice remained intact; [31] those rights were deferred, to be reactivated upon termination of the agreement by the unilateral action of either party on ten-days' notice. To construe the April 6 agreement otherwise would result in an endless revolving door process. It would discourage unions, once they acquired the legal right to strike, from agreeing to withhold such action in a further and final effort to achieve labor peace. It would force unions to implement their strike power immediately upon its maturing and to engage in economic warfare. It would result in chaos in industrial relations governed by the Railway Labor Act, since it appears that unions, after the right to strike had accrued, have consented to moratoria in many instances.[32] It would defeat a principal purpose of the Railway Labor Act's procedures "[t]o avoid any interruption to commerce or to the operation of any carrier engaged therein."[33]

REA's contention has not found favor with those courts that have considered substantially the same situation as the one at bar.[34] The negotiators and the lawyers on both sides were exceptionally experienced in the field of labor relations law and the Railway Labor Act. To accept plaintiff's construction is to ascribe naivete to Union's representatives and subtlety to management's representatives.

REA contends that the decision in *Manning* v. *American Airlines, Inc.*[35] compels a finding that the April 6, 1972 agreement comes within the purview of section 6. However, that decision upon its facts is distinguishable and is not controlling in the instant case. *Manning* involved a section 6 notice proposing a change in a union dues check-off agreement supplemental to the basic collective bargaining agreement, in no way analogous to the April 6 agreement. There the Act's procedures had not previously been brought into play and processed—significantly, the Court in *Manning* stated that holding the check-off agreement to be within section 6 accomplished that section's purpose of "prevent[ing] rocking of the boat by either side until the procedures of the Railway Labor Act were exhausted." [36] Here the procedures had already been exhausted and the Union's right to strike had matured.

### THE CLAIM THAT BRAC VIOLATED SECTION 2 FIRST OF THE ACT

■ REA, however, claims that BRAC acquired no right to strike because it failed, as required by section 2

---

31. *Cf.* Erie Lackawanna Ry. v. Lighter Captains Local 996, 338 F.Supp. 955 (D. N.J.1972); American Airlines, Inc. v. Air Line Pilots Ass'n, Int'l, 169 F.Supp. 777, 791 (S.D.N.Y.1958).

32. *See, e. g.*, cases cited in note 31 *supra.*

33. 45 U.S.C. § 151a.

34. *See* Pullman Co. v. Order of Ry. Conductors & Brakemen, 316 F.2d 556, 562–563 (7th Cir.), cert. denied, 375 U.S. 820, 84 S.Ct. 57, 11 L.Ed.2d 54 (1963); Pan Am. World Airways, Inc. v. Flight Eng'rs Int'l Ass'n, 306 F.2d 840, 846–847 (2d Cir. 1962); Flight Eng'rs Int'l Ass'n v. Eastern Air Lines, Inc., 208 F.

Supp. 182, 190 (S.D.N.Y.), aff'd per curiam, 307 F.2d 510 (2d Cir. 1962), cert. denied, 372 U.S. 945, 83 S.Ct. 934, 9 L.Ed.2d 970 (1963); Northwest Airlines, Inc. v. Airline Pilots Ass'n, Int'l, 185 F.Supp. 77, 80 (D.Minn.1960); American Airlines, Inc. v. Air Line Pilots Ass'n, Int'l, 169 F.Supp. 777 (S.D.N.Y. 1958); *cf.* Eastern Air Lines, Inc. v. Flight Eng'rs Int'l Ass'n, 340 F.2d 104, 106 (5th Cir.), cert. denied, 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 59 (1965).

35. 329 F.2d 32 (2d Cir.), cert. denied, 379 U.S. 817, 85 S.Ct. 33, 13 L.Ed.2d 29 (1964).

36. *Id.* at 35.

First of the Act [37] "to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes." The Supreme Court, in *Chicago and North Western Railway* v. *United Transportation Union*,[38] held that the requirement imposes a legal obligation upon management and labor that is judicially enforceable. The Court did not specify the standard to be applied in determining what constitutes a section 2 First violation; [39] however, it cautioned the courts to use restraint in granting injunctions based on alleged violations.[40] The federal labor policy against governmental interference with the process of voluntary collective bargaining requires that a party charging the other with a section 2 First violation must make a strong showing in order to obtain injunctive relief.[41]

At the outset it should be noted, as the Supreme Court emphasized, that under the Railway Labor Act the duty imposed upon the parties is to "exert every reasonable effort," whereas under the National Labor Relations Act it is "to confer in good faith." [42] Those decisions which have considered section 2 First violations are not altogether clear as to which statutory mandate was applied or whether the terms were deemed synonymous.[43] REA contends that the

37. 45 U.S.C. § 152 First.

38. 402 U.S. 570, 91 S.Ct. 1731, 29 L.Ed. 2d 187 (1971).

39. *Id.* at 574, 579 n. 11, 91 S.Ct. 1731.

40. "[W]e note two caveats. First, parallels between the duty to bargain in good faith and the duty to exert every reasonable effort, like all parallels between the NLRA and the Railway Labor Act, should be drawn with the utmost care and with full awareness of the differences between the statutory schemes. Cf. *Brotherhood of Railroad Trainmen* v. *Jacksonville Terminal Co.*, 394 U.S. 369, 383 [89 S.Ct. 1109, 1118, 22 L.Ed.2d 344] (1969). Second, great circumspection should be used in going beyond cases involving 'desire not to reach an agreement,' for doing so risks infringement of the strong federal labor policy against governmental interference with the substantive terms of collective-bargaining agreements. . . ."
*Id.* at 579 n. 11, 91 S.Ct. at 1736; *see id.* at 583, 91 S.Ct. 1731; Erie Lackawanna Ry. v. Lighter Captains Local 996, 338 F.Supp. 955, 962 (D.N.J.1972). *See also* Norris-LaGuardia Act § 4, 29 U.S.C. § 104.

41. *Cf.* Chicago, R. I. & Pac. R.R. v. Switchmen's Union, 292 F.2d 61, 70–71 (2d Cir. 1961), cert. denied, 370 U.S. 936, 82 S.Ct. 1578, 8 L.Ed.2d 806 (1962).

42. 29 U.S.C. § 158(d).

43. Some courts have specifically equated the § 2 First requirement with the duty to bargain in good faith. *See, e. g.,* Erie Lackawanna Ry. v. Lighter Captains Local 996, 338 F.Supp. 955, 962 (D.N.J. 1972) ; International Ass'n of Machinists & Aerospace Workers v. National Ry. Labor Conference, 310 F.Supp. 905, 913 & n. 8 (D.D.C.1970), vacated as moot sub nom. Alton & S. Ry. v. International Ass'n of Machinists & Aerospace Workers, 150 U.S.App.D.C. 36, 463 F.2d 872 (1972) ; *cf.* Long Island R. R. v. System Fed'n No. 156, 289 F.Supp. 119 (E.D. N.Y.1968) ; *see also* American Airlines, Inc. v. Air Line Pilots Ass'n, Int'l, 169 F.Supp. 777, 793–794 (S.D.N.Y.1958). Others have referred to the general duty of the carrier and the union "to exert every reasonable effort" to come to an agreement, but then appear to have employed a "good faith" standard in evaluating the actual conduct of the parties. *See* Piedmont Aviation, Inc. v. Air Line Pilots Ass'n, Int'l, 416 F.2d 633 (4th Cir. 1969), cert. denied, 397 U.S. 926, 90 S.Ct. 924, 25 L.Ed.2d 105 (1970) ; Chicago & N. W. Ry. v. United Transp. Union, 336 F.Supp. 1149 (N.D.Ill.1971) ; Chicago & N. W. Ry. v. United Transp. Union, 330 F.Supp. 646 (N.D.Ill.1971) ; *cf.* In re Penn Cent. Transp. Co., 347 F.Supp. 1356, 1363–1364 (E.D.Pa.1972). In light of the above, prior cases are useful only to the extent that they provide various guides as to what forms of conduct do or do not constitute compliance with § 2 First. One primary concern has been whether the attitude of the particular party was such that it amounted to a refusal to bargain. *See* Piedmont Aviation, Inc. v. Air Line Pilots Ass'n, Int'l, 416 F.2d 633 (4th Cir. 1969), cert. denied, 397 U.S. 926, 90 S.Ct. 924, 25 L.Ed.2d 105 (1970) ; Chicago & N. W. Ry. v. United Transp. Union, 330 F.Supp. 646

use of the term "exert" in the Railway Act, as contrasted with "confer" in the Labor Act imposes upon the carrier and its employees a higher standard of negotiation effort to settle disputes than in the instance of an employer and union governed by the Labor Relations Act. Probably a stronger argument in support of plaintiff's position is that in the event of failure of negotiations, with a resulting strike against the carrier, the impact upon the public is greater than when a private employer is struck. The Court assumes, as plaintiff contends, that a more stringent duty is required under section 2 First of the Railway Act.

Preliminarily, a question arises as to the period to be considered in determining plaintiff's claim. First, there is the period following the service on April 1, 1971, of the Union's section 6 notices up to March 25, 1972, when each side acquired the right to use economic pressures absent a violation of section 2 First. Then there is the period from April 6, 1972, the date of the status quo agreement, to October 20, 1972, when negotiations collapsed and the Union commenced its strike. REA's attorney previously acknowledged that the first was the applicable period, but now contends that the defendant's conduct from April 1, 1971, to the date of strike is the relevant frame of reference. This issue need not be resolved since, assuming that the period extends to October 20, 1972, plaintiff has failed upon all the evidence to establish that defendant violated the command of section 2 First.

The ultimate question, broadly stated, is did the Union negotiate the section 6 proposals with a sincere purpose to settle the dispute, or did it merely go through the motions of compliance with the required procedures, but with "a desire not to reach an agreement?"[44] The inquiry must be viewed against the background of the factual situation. BRAC's prime concern was the wage scale. The last increase was in effect since June 30, 1970. REA's first wage offer was made during the early September 1972 bargaining sessions, more than seventeen months after BRAC had served notice of its wage and other proposals. Undoubtedly there were strong feelings on both sides, much of it engendered by REA's "frozen" position over that extended period that a wage increase without working rules changes would force it into bankruptcy. Its adamant attitude on the wage issue was not readily accepted by the negotiating committee of the Express General Chairmen, who attributed REA's situation to undercapitalization and mismanagement. As already recounted, the conflict between management and the Chairmen

(N.D.Ill.1971) (adoption of a "take-it or leave-it" attitude at all times); cf. Atlanta & W. Point R. R. v. United Transp. Union, 307 F.Supp. 1205, 1211 (N.D.Ga. 1970), aff'd, 439 F.2d 73 (5th Cir.), cert. denied, 404 U.S. 825, 92 S.Ct. 53, 30 L.Ed. 2d 53 (1971); Atlantic C. Line R. R. v. Brotherhood of R. R. Trainmen, 262 F. Supp. 177, 183 (D.D.C.), aff'd in part, rev'd in part, 127 U.S.App.D.C. 298, 383 F.2d 225 (1967), cert. denied, 389 U.S. 1047, 88 S.Ct. 790, 19 L.Ed.2d 839 (1968); see also American Airlines, Inc. v. Air Line Pilots Ass'n, Int'l, 169 F. Supp. 777, 794 (S.D.N.Y.1958). Additionally, the cases make it clear that a party does not violate its duty under the Act if it chooses to be adamant in its position. See Virginia Ry. v. System Fed'n No. 40, 300 U.S. 515, 548, 57 S.Ct. 592, 81 L.Ed. 789 (1937); Pan Am. World Airways, Inc. v. Flight Eng'rs'

Int'l Ass'n, 306 F.2d 840, 849 (2d Cir. 1962); Chicago & N. W. Ry. v. United Transp. Union, 336 F.Supp. 1149, 1166–1167 (N.D.Ill.1971); see also Brotherhood of R. R. Trainmen v. Atlantic C. Line R. R., 127 U.S.App.D.C. 298, 383 F.2d 225, 229 (1967), cert. denied, 389 U.S. 1047, 88 S.Ct. 790, 19 L.Ed.2d 839 (1968) ("[T]he Act does not require efforts clearly at war with reality."); Chicago, R. I. & Pac. R. R. v. Switchmen's Union, 292 F.2d 61, 70 (2d Cir. 1961), cert. denied, 370 U.S. 936, 82 S.Ct. 1578, 8 L.Ed.2d 806 (1962).

44. Cf. Chicago & N. W. Ry. v. United Transp. Union, 402 U.S. 570, 578, 91 S.Ct. 1731, 29 L.Ed.2d 187 (1971); Virginia Ry. v. System Fed'n No. 40, 300 U.S. 515, 548, 57 S.Ct. 592, 81 L. Ed. 789 (1937); cases cited in note 43 supra.

led, at REA's request, to the intervention of Dennis, who was more sympathetic to REA's plea of financial distress than were the Chairmen. After mediation efforts failed in late 1971, the Chairmen favored an immediate strike as the effective means of obtaining a wage increase and agreement on other proposals; however, Dennis withheld strike action and continued negotiations. REA claims that these and other policy differences [45] in the Union leadership, or, as it prefers to refer to them, the schism within the Union, foreclosed any meaningful negotiation as required by section 2 First, and constituted a violation thereof.

Vigorous dissent in the conduct of union affairs is as much part of the democratic process as it is in public affairs. The differences among the Union officials in the instant case in no way impaired the quality of their negotiations. That their disagreements led to proposals which management deemed unacceptable did not reflect a purpose not to conclude an agreement. The record is to the contrary. Dennis brought a high order of statesmanlike leadership into the negotiations. His was the voice of authority and on behalf of the Union he more than exerted every reasonable effort to resolve the differences. Accepting at face value REA's claim of financial inability, he stayed his hand for many months, during which REA failed to make any wage increase offer. He exerted the prestige of his office as a national labor leader in an effort to obtain congressional and other governmental financial assistance for REA. Final-

ly, perhaps the strongest evidence to repel plaintiff's charge is the April 6 agreement itself, which permitted resumption of negotiations in which he played a leading and important role to October 1972, when he did issue the strike call—action he felt was compelled by REA's inadequate wage offer, which also failed to provide for retroactivity to July 1, 1971. Dennis' activities, by themselves, negate plaintiff's charge of a section 2 First violation. The other Union representatives both before and after Dennis' intervention, exhibited a willingness to meet and bargain with REA's representatives. Although they differed strongly with management, they cooperated with the Mediation Board in its efforts to bring about an agreement.[46] They urged the Board to undertake its mediation services promptly, whereas REA sought to defer its activities. Even after the strike call went out and for the few days it was on, these representatives were still prepared to "sit night and day" to hammer out an agreement, but REA remained rigid on its final basic wage position.

■■ REA seeks to fragmentize the various proposals advanced by BRAC, but these, as well as REA's must be viewed in totality and against what clearly was the dominant issue separating the parties. Were its position of isolating and dissecting each proposal accepted, the right to resort to self help over a specific major dispute—in this instance the prime issue, a wage increase [47]—would be almost meaningless. The mere presence of a nonbargainable demand in the Union's extensive section 6 notices [48] or its failure to

45. *See* note 20 *supra.*

46. *See* note 43 *supra.*

47. That subjects such as the Merchant Agents Agreement and the suggestion by the Express General Chairmen that the current management resign were mentioned during the meetings between the parties cannot obscure the fact that the hard core of the impasse was the Union's dissatisfaction with REA's attitude on wage proposals. The record *does* not sup-

port REA's charge that the above subjects ever took on the characteristics of a demand, acceptance of which was a precondition to any settlement of the dispute between the parties.

48. However, the Court intimates no view that BRAC's § 6 notices did in fact contain non-bargainable or illegal demands. *See* Atlantic C. Line R.R. v. Brotherhood of R.R. Trainmen, 262 F.Supp. 177, 185 (D.D.C.), aff'd in part, rev'd in part,

make concessions requested by management [49] would bar it from calling a strike over a dispute which had been adequately processed through the Act's mandatory procedures and as to which "every reasonable effort" had been exerted to reach a settlement. That the Union adhered to its demand for a substantial wage increase, and would not comply with REA's requests to defer any wage increase or accept in its place what REA considered "break-through items" (e.g., early retirement, profit sharing, stock participation proposals), does not establish a breach of its duty under section 2 First.[50]

■■■■ BRAC was not bound to accept REA's "final" offer which, according to BRAC, did not approach the wage level paid by other employers in the transportation industry for comparable services, and also failed to meet the annual rate of inflation. That a carrier is in economic straits does not require its employees to carry the burden of its economic problems.[51] REA is a private enterprise corporation operating under a laissez faire economy; the circumstance that it cannot meet the demands of a competitive system and may face bankruptcy, if such be the fact, does not require its employees to accept a wage they deem inadequate and to surrender their legal right to strike once the procedures under the Act have been met. To hold that the employees' assertion of their rights manifests a failure to exert every reasonable effort to resolve all disputes and thereby constitutes a section 2 First violation is without validity. It suggests that a court has the power to apply a coercive force upon the employees to yield to the carrier's offer even though they deem it inadequate—in effect, it would impose upon them the financing of an undercapitalized carrier when its own stockholders, here few in number,[52] refuse to make further investments and supply needed capital. While BRAC was required to exert every reasonable effort to end the dispute, this did not mean that it was required to surrender its position

127 U.S.App.D.C. 298, 383 F.2d 225 (1967), cert. denied, 389 U.S. 1047, 88 S.Ct. 790, 19 L.Ed.2d 839 (1968).

49. *Cf.* Virginia Ry. v. System Fed'n No. 40, 300 U.S. 515, 548, 57 S.Ct. 592, 81 L.Ed. 789 (1937) ; Brotherhood of R.R. Trainmen v. Akron & B. Belt R.R., 128 U.S.App.D.C. 59, 385 F.2d 581, 597 (1967), cert. denied, 390 U.S. 923, 88 S.Ct. 851, 19 L.Ed.2d 983 (1968) ; Pan Am. World Airways, Inc. v. Flight Eng'rs Int'l Ass'n, 306 F.2d 840, 849 (2d Cir. 1962) ; Chicago & N. W. Ry. v. United Transp. Union, 336 F.Supp. 1149, 1166 (N.D.Ill.1971).

50. *Cf.* Pan Am. World Airways, Inc. v. Flight Eng'rs' Int'l Ass'n, 306 F.2d 840, 849 (2d Cir. 1962) ; Chicago & N. W. Ry. v. United Transp. Union, 336 F.Supp. 1149, 1166–1167 (N.D.Ill.1971) ; American Airlines, Inc. v. Air Line Pilots Ass'n, Int'l, 169 F.Supp. 777, 796 (S.D. N.Y.1958) ; *see also* Chicago, R. I. & Pac. R.R. v. Switchmen's Union, 292 F.2d 61, 70 (2d Cir. 1961), cert. denied, 370 U.S. 936, 82 S.Ct. 1578, 8 L.Ed.2d 806 (1962).

51. REA contends that a strike, even of moderate duration, would spell ruin for the Company and result in irreparable harm to it, its customers and the public. While consideration of the Company's and the public's interest may be determinative on a motion for a preliminary injunction, such is not the case when, as here, the Court is deciding whether permanent injunctive relief should be granted. *Cf.* Brotherhood of R.R. Trainmen v. Southern Ry., 393 F.2d 303, 309–310 (5th Cir. 1968) ; Pan Am. World Airways, Inc. v. Flight Eng'rs Int'l Ass'n, 306 F.2d 840, 850 (2d Cir. 1962) ; Akron, C. & Y. R.R. v. International Bhd. of Elec. Workers, 237 F.Supp. 343 (N.D.Ill. 1964) ; *see also* Brotherhood of R.R. Trainmen v. Jacksonville Terminal Co., 394 U.S. 369, 89 S.Ct. 1109, 22 L.Ed.2d 344 (1969). In almost any situation under the Railway Labor Act a strike by the carrier's employees is bound to have severe and damaging consequences for the parties involved as well as the public. Nonetheless, the Act permits the Union, as well as the carrier, to resort to self help once there has been compliance with the statutory provisions.

52. There are eight major stockholders, four of whom own 80% of the total outstanding shares; one of the four is Kole, REA's President, who owns 11%.

entirely,[53] or the legal rights of its members.

When the ballot was sent to the employees following the granting of the temporary restraining order, they were fully advised in separate communications by management and the Union of all the pertinent facts. They were made aware that a strike may result in REA's bankruptcy; the permanent loss of jobs for thousands of their number; unemployment for a period of time for many others; loss of pension payments to former employees and other disabilities. But the right of decision is theirs; it is not management's; it is not the Court's.

Plaintiff's further contention that BRAC's demand for a wage increase in excess of the 5.5% guideline limit under the Economic Stabilization Act of 1970[54] in and of itself not only violated that statute, but also section 2 First of the Railway Labor Act is without merit. The Stabilization Act permits increases over the 5.5% standard "to prevent gross inequities," and has

other exceptions,[55] some of which appear applicable to BRAC's claim that its members over an extended period have been working at wage rates much below those paid to others for comparable services in the industry.[56] Neither the Stabilization Act nor the regulations applicable during the negotiating period foreclosed the parties from agreeing upon a wage rate to correct the alleged inequitable situation, subject to approval by the Board prior to its implementation.[57]

Plaintiff, under its third cause of action, alleges that BRAC violated section 2 First when it failed, contrary to an alleged oral agreement, to poll the employees on REA's "final" offer of September 29, 1972 for their acceptance or rejection.[58] It is true that Dennis in September 1972 contemplated soliciting the views of the membership at large as to an REA wage offer before deciding to issue a strike call, just as he had polled them in March 1972. However, he decided since some seventeen months

53. As stated by the court in Chicago & N. W. Ry. v. United Transp. Union, 336 F.Supp. 1149, 1166 (N.D.Ill.1971):
"[I]f good faith bargaining should be held to require each party to modify its position until an agreement is reached, that in effect would abolish the right of either side to resort to self help. That would contravene and defeat the very statute involved herein and empower this Court to arbitrate the controversy. . . ."
See also Ruby v. Taca Int'l Airlines, S.A., 439 F.2d 1359, 1364–1365 (5th Cir. 1971); Florida E. C. Ry. v. Brotherhood of R.R. Trainmen, 336 F.2d 172, 181 (5th Cir. 1964), cert. denied, 379 U.S. 990, 85 S.Ct. 703, 13 L.Ed.2d 611 (1965).
It should be noted that during the October 1972 meetings BRAC did make wage counterproposals representing a recession from its original demand and including a suggestion that it might consider deferring payment of the retroactive portion.

54. Pub.L. No. 91–379, tit. II, 84 Stat. 799, as amended. Note to 12 U.S.C.A. § 1904 (Supp.1973). See generally Amalgamated Meat Cutters v. Connally, 337 F.Supp. 737 (D.D.C.1971). The applicable regulation is 6 C.F.R. § 201.10 (1972).

55. See Pub.L. No. 91–379, tit. II, § 203(a); 6 C.F.R. § 201.11 (1972). In one instance the Pay Board approved wage increases ranging from 9.8% to 12%; the employees had negotiated increases as high as 15%. Pay Board Release No. 85, CCH Economic Controls ¶ 1623.05 (May 8, 1972).

56. C. L. Dennis testified that there was a $2 per hour difference between salaries for truck drivers generally and truck drivers for REA, and that REA's clerical workers earned approximately $1.75 per hour less than those doing comparable work elsewhere.

57. See United States v. Great Atl. & Pac. Tea Co., 342 F.Supp. 272, 277 (D.Md. 1972); 6 C.F.R. § 201.17 (1972) ("[I]t shall not be a violation to bargain for . . . or agree to (as contrasted with paying or receiving) a wage . . . increase in excess of the maximum permissible . . . ."); id. § 202.10.

58. After the strike was called, REA on its own sent out ballots to 16,000 employees, but only approximately 25% responded. 2,361 voted to accept the offer and not strike; 1,702 refused the offer and voted to strike; and 141 were disqualified.

had elapsed before REA made the offer which he deemed inadequate that no purpose would be served by further delay of a strike call. His contemplation of such a poll does not establish REA's claim that it increased its final offer upon an agreement that such a poll would be conducted. After consideration of the testimony on this subject and the demeanor of the witnesses who testified with respect thereto, the Court finds that no agreement such as is alleged by REA was made. The record compels rejection of its claim.

Plaintiff makes other contentions, all of which have been considered, but they are so patently without substance as to require no discussion.

In sum, the Court finds that plaintiff has failed to carry its burden of proof as to each alleged cause of action; that REA is not entitled to the injunctive or other relief it seeks—to the contrary, that there is no legal impediment to BRAC's right to resort to self help— that it is free to strike.

The foregoing shall constitute the Court's Findings of Fact and Conclusions of Law.

Judgment may be entered accordingly.